**WOLF HOLLOW I, L.P., Appellant,**

v.

**EL PASO MARKETING, L.P. and Enterprise Texas Pipeline, LLC, Appellees.**

**No. 14–09–00118–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Oct. 28, 2010.

Rehearing Overruled Dec. 16, 2010.

Jett Williams III, Jacks C. Nickens, Houston, for appellant.

D. Mitchell McFarland, Michael Hendryx, Kerry R. McEniry, Suzanne Reddell Chauvin, Renando De Leon Jr., Houston, for appellees.

Panel consists of Chief Justice HEDGES and Justices ANDERSON and CHRISTOPHER.

## OPINION

ADELE HEDGES, Chief Justice.

Wolf Hollow I, L.P. ("Wolf Hollow") appeals from a final judgment entered by the trial court following its grant of several motions for summary judgment filed by appellees, El Paso Marketing, L.P. ("El Paso") and Enterprise Texas Pipeline, LLC ("Enterprise"). The disputes between the parties all revolve around natural gas supply and transportation contracts. We modify and, as modified, affirm the portion of the judgment favoring El Paso and reverse and remand the portion favoring Enterprise.

## I. Background

Wolf Hollow owns and operates a natural gas fired power plant in Granbury, Texas. To ensure a supply of natural gas to the Granbury plant, Wolf Hollow's predecessor-in-interest entered into a Gas Supply and Fuel Management Agreement (the "Supply Agreement") with El Paso's predecessor-in-interest on March 8, 2001.[1] In December 2005, Wolf Hollow and El Paso executed the First Amendment to Gas Supply and Fuel Management Agreement, which modified certain sections of the Supply Agreement. Some of the more relevant provisions of these agreements are presented below.

The Supply Agreement addresses the quality of the gas to be supplied in section 14.1, which reads in relevant part as follows:

> Section 14.1 *Quality.* The quality of Quantity of Gas that [El Paso] sells, delivers or causes to be delivered to [Wolf Hollow] or for [Wolf Hollow's] account at the Point of Delivery shall meet or exceed the minimum gas quality specifications established in the [Enterprise] Transporter's Tariff; *provided, however,* that (i) if [Enterprise] fails to deliver Gas at the [Enterprise] Point of Delivery that meets such quality specifications, then [El Paso] shall assign to [Wolf Hollow], or otherwise cause [Wolf Hollow] to be subrogated to, any claim that [El Paso] may have against [Enterprise] as a result of such delivery failure under the Gas Transportation Agreements to which [Enterprise] is a party,

---

1. Wolf Hollow's predecessor-in-interest is AES Wolf Hollow, L.P. El Paso's predecessor-in-interest is El Paso Merchant Energy, L.P.

as assigned by [Wolf Hollow] to [El Paso]. . . .

Article XXI of the Supply Agreement is entitled "Default and Remedies." Section 21.1 provides:

*Delivery Failure,* (a) Unless excused by an Event of Force Majeure or by any other provision of this Agreement, if at any time [El Paso] determines that it will not be able to sell, deliver or cause to be delivered, or actually fails to sell, deliver or cause to be delivered, to [Wolf Hollow] or for the account of [Wolf Hollow] at the relevant Point of Delivery a Quantity of Gas in an amount equal to the Scheduled Delivery Quantity, [El Paso] shall immediately notify [Wolf Hollow] of [El Paso's] inability to fully perform its obligations under this Agreement and [Wolf Hollow] may seek to cover any failure or anticipated inability of [El Paso] to deliver the Scheduled Delivery Quantity by making such Gas purchases from other suppliers using the Cover Standard, and upon making such purchases shall be entitled to recover from [El Paso] the product of (i) the positive difference, if any, between the price of such replacement Gas and the price applicable to the Gas [El Paso] actually failed to deliver on such Day, and (ii) the amount by which the Scheduled Delivery Quantity for such Day exceeds the actual Quantity of Gas delivered to the relevant Point of Delivery by [El Paso] ("[El Paso's] Deficiency Quantity"). . . .

(b) If [Wolf Hollow] has used the Cover Standard in an effort to purchase [El Paso's] Deficiency Quantity from a third party Gas supplier and no such purchase, or portion thereof, is available, [El Paso] may provide replacement power at a location where [Wolf Hollow] would have otherwise delivered the capacity or energy that [Wolf Hollow] would have produced and delivered but for [El Paso's] Gas delivery failure in accordance with the following: [El Paso] shall notify [Wolf Hollow] whether it elects to provide replacement power no later than one (1) hour before the deadline for [Wolf Hollow] to indicate whether it will provide Replacement Power to Peco Energy under the Power Contract or to such other offtaker with whom [Wolf Hollow] has an effective power contract and to whom [Wolf Hollow] may contractually deliver Replacement Power (an "Alternative Offtaker"), as the case may be, and if so, [El Paso's] supply source, delivery point, and transmission arrangement. [Wolf Hollow] shall accept or reject, at its sole discretion, the proposed replacement power. . . .

(c) If [El Paso] is unable to provide replacement power or [Wolf Hollow] rejects [El Paso's] offer to provide replacement power, [Wolf Hollow] shall be entitled to recover from [El Paso] the sum of (i) the positive difference if, any, between the cost incurred by [Wolf Hollow] to purchase (utilizing the Cover Standard) energy or capacity to replace the energy or capacity [Wolf Hollow] could not produce at [Wolf Hollow's] Facility due to [El Paso's] Gas delivery failure and [Wolf Hollow's] avoided costs in purchasing such replacement energy or capacity and not producing the same at [Wolf Hollow's] Facility, (ii) any monthly reduction or complete loss of capacity payments under any power sales contract, including the Power Contract, then in effect to which [Wolf Hollow] is a party and invoiced from [Wolf Hollow] to [El Paso] monthly, and (iii) lost variable payments under any power sales contract, including the Power Contract, then in effect to which [Wolf Hollow] is a party to the extent those variable payments exceed $0.70 MWh. . . .

(d) [El Paso] shall pay to [Wolf Hollow] amounts due under this Section 21.1 within ten (10) Days following [El Paso's] receipt from [Wolf Hollow] of an invoice setting forth the amounts owed....

Section 21.2 of the Supply Agreement provides, in pertinent part:

*Event of Default.* (a) An Event of Default under this Agreement shall be deemed to exist upon the occurrence of any one or more of the following events, unless excused by an Event of Force Majeure: ...

(ii) failure by [El Paso] to deliver or cause to be delivered at the relevant Point of Delivery a Quantity of Gas that, in the aggregate, equals or exceeds 1.8 Bcf of all or any portion of the Scheduled Delivery Quantities that [Wolf Hollow] requests [El Paso] to deliver over the course of any Contract Year; or ...

(v) failure by either Party to perform fully any other material provision of this Agreement and (A) such failure continues for a period of sixty (60) Days after written notice of such non-performance is received by the non-performing party ...

Section 1.9 of the First Amendment modified the language found in Section 21.3 of the Supply Agreement. As amended, section 21.3 reads as follows:

*Remedies for Event of Default.* During any Event of Default, the party not in default shall have the right:

(a) To immediately suspend its performance under this Agreement, subject to the terms and conditions herein;

(b) To terminate this Agreement upon ten (10) Days written notice to the defaulting party and seek damages for the harm caused by the Event of Default;

(c) to pursue any other remedy provided under this Agreement, or now or hereafter existing at law or in equity or otherwise, including but not limited to:

(A) any rights and remedies available to a secured party, if any, under Article 9 of the Uniform Commercial Code of the jurisdiction in which the Performance Assurance is being held and any other applicable jurisdiction and any other applicable laws with respect to the Performance Assurance held by or for the benefit of seller;

(B) any right to set off any Performance Assurance held by it or for its benefit of against and in satisfaction of any amount payable by the other party under this Agreement; or

(C) any right to draw on any outstanding Letter of Credit issued for its benefit and apply proceeds therefrom, in addition to any Cash held by such party, against amounts payable by the other party under this Agreement.

Finally, in the Supply Agreement, Wolf Hollow and El Paso agreed to limit their liability:

Section 24.11 *Limitation of Liability; [El Paso] Liability Cap.* (a) EXCEPT AS SPECIFICALLY SET FORTH HEREIN, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR INCIDENTAL, SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES.

In addition, Wolf Hollow's predecessor-in-interest entered into a Transportation Agreement with Enterprise's predecessor-in-interest (EPGT Texas Pipeline, L.P.). Under the terms of the Transportation Agreement, Enterprise agreed to provide natural gas pipeline transportation service to Wolf Hollow's Granbury plant. Because the Transportation Agreement incorpo-

rates Enterprise's publicly filed tariff, it effectively contains two assignment clauses. The first states:

ASSIGNMENT: NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, SHIPPER [WOLF HOLLOW] MAY ASSIGN ITS RIGHTS AND OBLIGATIONS UNDER THIS AGREEMENT TO ANY PARTY THAT PROVIDES FUEL MANAGEMENT SERVICES TO SHIPPER OR AGREES TO SELL AND DELIVER GAS TO SHIPPER AT SHIPPER'S PLANT, UPON THE CONSENT OF TRANSPORTER [ENTERPRISE], WHICH CONSENT SHALL NOT BE UNREASONABLY WITHHELD. THE PARTIES AGREE THAT IT SHALL BE UNREASONABLE FOR TRANSPORTER TO WITHHOLD ITS CONSENT TO SUCH AN ASSIGNMENT IF (A) SHIPPER'S ASSIGNEE'S CREDITWORTHINESS MEETS OR EXCEEDS TRANSPORTER'S CREDIT REQUIREMENTS, (B) SHIPPER'S ASSIGNEE TAKES ASSIGNMENT OF THE WHOLE AGREEMENT, AND (C) SUCH ASSIGNMENT IS FOR A TERM OF AT LEAST ONE (1) YEAR.

The second, found in the publicly filed tariff, provides in relevant part as follows:

22.  ASSIGNMENT

The service agreement between Shipper and Transporter, including, without limitation, each indemnification, shall inure to and bind the permitted successors and assigns of Shipper and Transporter, provided neither Shipper nor Transporter shall transfer the service agreement without the prior written approval of the other and which approval may not be unreasonably withheld, delayed or conditioned. Such transfer shall not be effective until approved by the other party. Provided further, either Shipper or Transporter may transfer its interest to any parent or affiliate by assignment, merger or otherwise without the prior approval of the other, but no such transfer shall operate to relieve the transferor of its obligations hereunder. . . .

Wolf Hollow assigned the Transportation Agreement to El Paso.

In 2006 and early 2007, there were four brief interruptions in the delivery of natural gas to Wolf Hollow's power plant. The first occurred on August 9, 2006 due to an equipment failure on the Enterprise pipeline. The second occurred on September 11, 2006 when an Enterprise technician made a computer error which caused the line pressure to increase, in turn causing a gas flow shut-in at the Granbury power plant. The third incident, on January 8, 2007, again involved an equipment failure on the Enterprise pipeline. The fourth and final interruption occurred three days later, on January 11, 2007, and also was due to a pipeline equipment failure.

El Paso gave notice of these four interruptions as events of force majeure under the Supply Agreement; however, Wolf Hollow declined to agree that the interruptions were in fact excused under the contract.[2] In addition to the four interruptions, a dispute arose between Wolf Hollow and El Paso over the quality of the natural gas delivered to and accepted by Wolf Hollow. Specifically, Wolf Hollow alleges that the gas was contaminated by heavy liquid hydrocarbons, requiring periodic plant shutdowns.

Faced with these disputes, El Paso sought a declaratory judgment that it had

---

**2.** The force majeure provisions of the agreement are not reproduced herein because they are not central to our resolution of this case.

properly invoked the force majeure provisions and that it was not liable for Wolf Hollow's claims related to the quality of the gas delivered to the Granbury plant. Wolf Hollow filed a counterclaim against El Paso seeking damages for breach of contract, breach of warranties, and negligence.[3] Specifically, Wolf Hollow sought recovery for the following: (1) charges incurred for purchasing replacement power to meet its output commitments; (2) physical damage to the Granbury power plant; (3) the cost of procuring additional fuel treatment equipment; and (4) the costs for cleaning, replacing, and refurbishing various turbine parts. All of Wolf Hollow's alleged damages arose out of either the four gas delivery interruptions or the alleged delivery of contaminated natural gas.

El Paso also filed a third-party petition against Enterprise, seeking to recover contribution and indemnity for any liability that El Paso might have to Wolf Hollow. Wolf Hollow then filed a negligence cross-claim against Enterprise. According to Wolf Hollow, Enterprise was negligent when it (1) delivered gas that failed to comply with the quality specifications contained in the Transportation Agreement, and (2) permitted the four interruptions in gas delivery. From Enterprise, Wolf Hollow sought to recover: (1) the cost of replacement power, (2) amounts for damage to the Granbury plant, (3) sums expended in mitigation of damages, (4) the cost to purchase additional fuel treatment equipment, and (5) the costs of cleaning and refurbishing turbines at the Granbury facility.

All issues in the litigation were resolved by the trial court's rulings on a series of summary judgment motions filed by El Paso and Enterprise. In its rulings, the trial court disposed of Wolf Hollow's claims against El Paso on multiple grounds, all based on interpretations of language found in the Supply Agreement and the First Amendment thereto. Among its rulings, the trial court concluded that: (1) the four delivery interruptions were caused by events of force majeure which excused El Paso's performance; (2) all damages sought by Wolf Hollow were consequential damages barred by section 24.11 of the Supply Agreement; and (3) section 14.1 of the Supply Agreement created an exclusive remedy for Wolf Hollow's gas quality claims: an assignment by El Paso of any quality claims it might have against Enterprise. Also, without specifying the grounds, the trial court granted Enterprise's motion for summary judgment on Wolf Hollow's negligence claim. Following the issuance of its summary judgment orders, the trial court entered a final judgment ordering that Wolf Hollow take nothing on its claims against El Paso and Enterprise. The final judgment also granted a declaratory judgment favoring El Paso, declaring that (1) the four service interruptions constituted events of force majeure; (2) Wolf Hollow's exclusive remedy for its gas quality claims was an assignment of El Paso's claims against Enterprise; and (3) Article XXI ("Default and Remedies") of the Supply Agreement does not apply to Wolf Hollow's gas quality claims.

In nine issues on appeal, Wolf Hollow challenges the trial court's granting of El Paso's and Enterprise's motions for summary judgment. Eight of Wolf Hollow's issues address El Paso's motions for summary judgment. Wolf Hollow's ninth issue addresses summary judgment on its negligence cause of action against Enterprise.

---

**3.** Wolf Hollow eventually non-suited its negligence claim against El Paso, and it is not at issue in this appeal.

## II. Standards of Review

A movant for summary judgment has the burden of showing that there is no genuine issue of material fact, and thus, it is entitled to judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). If there is no genuine issue of material fact, summary judgment should be entered as a matter of law. *Haase v. Glazner*, 62 S.W.3d 795, 797 (Tex. 2001). We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005).

Because there are no disputed facts, this case presents only a matter of determining the legal effect of the language found in the Supply Agreement and the First Amendment thereto.[4] In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *Id.* at 662. Ordinarily, the writing alone is sufficient to express the parties' intentions for it is the objective, not subjective, intent that controls. *Matagorda Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex.2006) (per curiam). To determine intent, we examine and consider the entire writing in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *Valence Operating Co.*, 164 S.W.3d at 662. No single provision controls; rather, all the provisions must be considered with reference to the entire instrument. *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex.1962). We presume that every clause in the contract was intended by the parties to the contract to have some effect.

*Fein v. R.P.H., Inc.*, 68 S.W.3d 260, 266 (Tex.App.-Houston [14th Dist.] 2002, pet. denied) (citing *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996)). We construe contracts from a utilitarian standpoint, bearing in mind the particular business activity sought to be served, and will avoid when possible and proper, a construction which is unreasonable, inequitable, or oppressive. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex.2005). Courts, however, are not authorized to rewrite agreements by inserting additional terms, definitions, or provisions that the parties could have included themselves but did not, or by implying terms for which the parties have not bargained. *Tenneco, Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex.1996). In other words, courts cannot make contracts for the parties. *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 888 (Tex.1998).

## III. Summary Judgment for El Paso

Wolf Hollow essentially makes two types of claims against El Paso: those pertaining to the four delivery interruptions and those pertaining to alleged damages resulting from the delivery of contaminated gas. In one of its motions for summary judgment, El Paso contended that all of Wolf Hollow's claims sought consequential damages which were expressly waived under section 24.11 of the Supply Agreement. The trial court granted this motion, effectively defeating all of Wolf Hollow's claims. In its seventh appellate issue, Wolf Hollow contends that the trial court erred in characterizing its damages as "incidental, spe-

---

4. The parties agree that the Supply Agreement is governed by New York law. The parties also assert at various times in their briefs that, at least on the issues raised in this appeal, New York and Texas law are the same. Finally, the parties made no attempt to demonstrate any differences between the relevant law of New York and Texas. Therefore, we presume there is no difference between the law of New York and Texas and apply Texas law. *Exxon Mobil Corp. v. Kinder Morgan Operating L.P. "A"*, 192 S.W.3d 120, 124 n. 5 (Tex.App.-Houston [14th Dist.] 2006, no pet.).

cial, indirect, or consequential" and in holding that such damages were waived under section 24.11. We will begin by addressing whether Wolf Hollow's claims pertaining to the four service interruptions sought consequential damages and whether its gas quality claims sought consequential damages. We will then consider Wolf Hollow's eighth issue in which it contended that the trial court erred in finding that Wolf Hollow had sustained no direct damages on claims the trial court had already disposed of on other summary judgment grounds.[5]

### A. Consequential Damages for Service Interruptions

■ In its Amended Counterclaim, Wolf Hollow alleged that due to the four service interruptions, it was forced to purchase replacement power in order to fulfill its dispatch commitments. El Paso asserted in one of its motions for summary judgment that the purchase of replacement power was a consequential damage barred by section 24.11(a) of the Supply Agreement. That section reads as follows: "EXCEPT AS SPECIFICALLY SET FORTH HEREIN, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR INCIDENTAL, SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES." The trial court granted this motion for summary judgment.

On appeal, Wolf Hollow contends that the cost of replacement power occasioned by the four service interruptions constituted direct damages and that the trial court therefore erred in characterizing such costs as consequential damages. In support of this contention, Wolf Hollow cites to common law distinctions between "direct damages" and "consequential damages." *See, e.g., Tenn. Gas Pipeline Co. v. Technip USA Corp.*, 2008 WL 3876141, at *7–11 (Tex.App.-Houston [1st Dist.] August 21, 2008, pet. denied). Although the Supply Agreement contains elements of both the sale of goods and the provision of services, the sale of goods is the dominant theme of the Agreement. Consequently, article 2 of the Uniform Commercial Code ("UCC") applies and common law principles do not apply to the extent they conflict with provisions of the UCC. *See* Tex. Bus. & Comm.Code § 2.102; *Graybar Elec. Co. v. LEM & Assocs., L.L.C.*, 252 S.W.3d 536, 542 (Tex.App.-Houston [14th Dist.] 2008, no pet.); *see also El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 313 (Tex.1999) (holding that contract for buying and selling oil and gas was a transaction involving "goods" and thus governed by the UCC); *Natural Gas Clearinghouse v. Midgard Energy Co.*, 113 S.W.3d 400, 408 n. 3 (Tex.App.-Amarillo 2003, pet. denied) (following *Minco*). The Texas common law and the UCC do not utilize the same definitions of direct and consequential damages. *See Wade & Sons, Inc. v. Am. Standard, Inc.*, 127 S.W.3d 814, 823–24 (Tex.App.-San Antonio

---

**5.** In its eight issues pertaining to the summary judgment favoring El Paso, Wolf Hollow contends that the trial court erred in finding that (1) the four service interruptions constituted, or arose from, events of force majeure; (2) El Paso's fuel management obligations in the Supply Agreement do not extend to issues of gas quality; (3) Wolf Hollow's exclusive remedy for fuel quality claims is an assignment of El Paso's claims against Enterprise; (4) Article XXI of the Supply Agreement does not apply to issues of gas quality; (5) Wolf Hollow's gas quality claims have been released or waived pursuant to section 2.2 of the First Amendment; (6) Wolf Hollow's gas quality claims have been released or waived pursuant to the indemnity provision in section 16.1 of the Supply Agreement; (7) certain damages were "incidental, special, indirect, or consequential"; and (8) Wolf Hollow sustained no direct damages.

2003, pet. denied).[6]

Under UCC section 2.713, the measure of a buyer's damages for non-delivery of a product is calculated by the difference between the market price for the same type of product at the time when the buyer learned of the breach and the contract price, together with any incidental and consequential damages provided in chapter 2. Tex. Bus. & Coram. Code § 2.713 & cmt. 2. The product at issue here was natural gas; thus, the cost for replacement power would not be an appropriate measure of direct damages under the section. Wolf Hollow's argument to the contrary is without merit.

UCC section 2.715 defines consequential damages as "(1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and (2) injury to person or property proximately resulting from any breach of warranty." *Id.* § 2.715. Although Wolf Hollow has alleged that the cost of replacement power resulted from requirements (specifically Wolf Hollow's energy dispatch obligations to its customers) that El Paso knew about, section 24.11(a) of the Agreement expressly excludes recovery of consequential damages. UCC section 2.719 permits parties to modify available remedies and specifically permits consequential damages to be limited or excluded so long as such limitation or exclusion is not unconscionable. *Id.* § 2.719. Therefore, even if Wolf Hollow is correct about El Paso's knowledge, these damages are consequential damages, which are barred by the Supply Agreement.

Wolf Hollow additionally appears to argue that it was entitled to recover as damages its replacement energy costs because such recovery was expressly contemplated by the Supply Agreement. Wolf Hollow first points out that section 24.11 of the agreement barred consequential damages "except as specifically set forth" in the agreement. Wolf Hollow then insists that section 21.1(c) specifically authorizes its recovery of replacement power costs. This subsection indeed mentions the possibility that Wolf Hollow could recover the cost to purchase replacement power; however, it limits this possibility to certain specific circumstances.

Section 21.1, as a whole, sets up a scheme accounting for the possibility that El Paso might fail to deliver a scheduled quantity of gas. Subsection 21.1(a) states that:

> Unless excused by an Event of Force Majeure . . ., if at any time [El Paso] determines that it will not be able to [deliver] a Quantity of Gas in an amount equal to the Scheduled Delivery Quantity, [El Paso] shall immediately notify [Wolf Hollow] and [Wolf Hollow] may seek to cover . . . by making such Gas purchases from other suppliers using the Cover Standard, and . . . recover from [El Paso] the . . . difference, if any, between the price of such replacement Gas and the price applicable to the Gas that [El Paso] actually failed or anticipates failing to deliver. . . .

Subsection 21.1(b) then states that:

> If [Wolf Hollow] has used the Cover Standard in an effort to purchase [El Paso's] Deficiency Quantity from a third-party Gas supplier and no such

---

**6.** The *Tennessee Gas Pipeline* case cited by Wolf Hollow and our own recent opinion in *Cherokee County Cogeneration Partners, L.P. v. Dynegy Marketing and Trade*, 305 S.W.3d 309

(Tex.App.-Houston [14th Dist.] 2009, no pet.), are therefore distinguishable because they applied common law and not UCC principles.

purchase, or portion thereof, is available, [El Paso] may provide replacement power at a location where [Wolf Hollow] would have otherwise delivered the capacity ... but for [El Paso's] Gas delivery failure....

This subsection further provides that El Paso has to timely notify Wolf Hollow that it elects to provide replacement power and that Wolf Hollow has discretion to accept or reject the replacement power.

Subsection 21.1(c) then provides that:

If [El Paso] is unable to provide replacement power or [Wolf Hollow] rejects [El Paso's] offer to provide replacement power, [Wolf Hollow] shall be entitled to recover from [El Paso] the sum of [among other things] the positive difference [if any] between the cost incurred by [Wolf Hollow] to purchase ... energy or capacity to replace the energy or capacity [Wolf Hollow] could not produce at [its] Facility due to [El Paso's] Gas delivery failure and [Wolf Hollow's] avoided costs in purchasing such replacement energy or capacity and not producing the same at [its] Facility....

Wolf Hollow contends that subsection (c) permits it to purchase, and be reimbursed for, replacement power in the event of a service disruption without regard to whether the steps set forth in subsections (a) and (b) have been undertaken. However, read in isolation, subsection 21.1(c) is meaningless. It states that Wolf Hollow is entitled to be reimbursed for replacement power if El Paso is unable to provide such power or Wolf Hollow rejects such power, but it does not explain under what circumstances El Paso would be offering replacement power. In other words, it merely states a remedy without stating the occurrence for which a remedy is needed. It is only by reference to the earlier portions of section 21.1 that subsection 21.1(c) makes sense. When read in its entirety, section 21.1 makes it clear that the provisions of subsection (c) apply only when the steps in subsections (a) and (b) have been followed. More specifically, Wolf Hollow can be reimbursed for replacement power only if: (1) under subsection (a), El Paso is unable to deliver a scheduled quantity of gas; (2) under subsection (b), Wolf Hollow has been unsuccessful in attempting to cover by purchasing gas from other suppliers; and (3) under subsection (c), El Paso was unable to provide replacement power or Wolf Hollow rejected El Paso's offer of replacement power. This reading of section 21.1 is reinforced by the fact that both subsection (b) and (c) begin with "if-then" clauses that tie them to the circumstances discussed in the immediately preceding subsection. Wolf Hollow does not contend that all of the predicates to its recovery of replacement power costs under Section 21.1 occurred in this case. In short, section 21.1 provides very specific remedies for very specific circumstances that Wolf Hollow does not allege occurred in this case. Wolf Hollow's asserted damages based on the four service interruptions are all consequential damages barred under the Supply Agreement.

## B. Consequential Damages for Quality Issues

■ Wolf Hollow's claims based on the alleged delivery of contaminated natural gas sought recovery for (1) physical damage to the Granbury power plant; (2) costs for cleaning, replacing, and refurbishing various turbine parts; (3) charges incurred for purchasing replacement power during shutdowns occasioned by the need for cleaning, replacing, and refurbishing of parts; and (4) costs for procuring additional fuel treatment equipment required due to the delivery of contaminated gas. As explained above, the trial court granted summary judgment against these claims

and damages based on the waiver of consequential damages contained in section 24.11 of the Supply Agreement, and Wolf Hollow challenges this holding in issue 7.

Wolf Hollow correctly points out that under the UCC, a buyer's damages for non-conforming goods, when such goods are nonetheless accepted by the buyer, are governed by section 2.714, which reads in full as follows:

> **§ 2.714. Buyer's Damages for Breach in Regard to Accepted Goods**
>
> (a) Where the buyer has accepted goods and given notification (Subsection (c) of Section 2.607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
>
> (b) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
>
> (c) In a proper case any incidental and consequential damages under the next section may also be recovered.

Tex. Bus. & Comm.Code § 2.714.[7] As stated in the UCC section, the typical measure of damages in such situations is "the difference ... between the value of the goods accepted and the value they would have had if they had been as warranted." *Id.* § 2.714(a). In this lawsuit, however, Wolf Hollow is not seeking damages by this measure. Instead, Wolf Hollow states that it is seeking damages based on the portion of section 2.714(a) that provides

the general measure applies "unless special circumstances show proximate damages of a different amount." *Id.* In short, Wolf Hollow argues that the need to purchase replacement power was a "special circumstance" or, at least, was due to "special circumstances." Wolf Hollow, however, offers no analysis or citation supporting its assertion that the purchase of replacement power constituted or was caused by a "special circumstance." Although it might be possible to speculate regarding special circumstances in this case, we decline to make Wolf Hollow's argument or case for it.

Next, Wolf Hollow argues that even if the cost of replacement power is deemed a consequential damage, such costs are still recoverable under the Supply Agreement. More specifically, Wolf Hollow points out that section 24.11 provides that consequential damages are barred "[e]xcept as specifically set forth herein." Further according to Wolf Hollow, section 21.3(c), as amended, permits recovery of consequential damages wherein it states that; "During any Event of Default, the Party not in default shall have the right ... to pursue any other remedy provided under this Agreement, or now or hereafter existing at law or in equity or otherwise...." Wolf Hollow claims that the gas contamination constituted an "Event of Default" under the Agreement.

Wolf Hollow's interpretation of these provisions, however, would effectively nullify the waiver of consequential damages and, in so doing, violate a principle tenet of contract construction: specific provisions of a contract govern over general ones. *See, e.g., Grynberg v. Grey Wolf Drilling Co., L.P.,* 296 S.W.3d 132, 137 & n. 17 (Tex.App.-Houston [14th Dist.] 2009, pet.

---

**7.** As explained in the immediately previous section of this opinion, Wolf Hollows citation to common law definitions of direct and con-

sequential damages are not applicable under the facts of this case.

denied) (citing *Forban v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex.1994)). Section 24.11 waives consequential damages except as may be *specifically* provided in other portions of the contract. The language in section 21.3(c) highlighted by Wolf Hollow states very generally that a nondefaulting party may be entitled to any remedy under the agreement or otherwise existing at law or in equity. Therefore, the language in section 21.3(c) neither controls over the more specific statement in section 24.11 nor does it fulfill the requirement in section 24.11 that to be recoverable, consequential damages must be "specifically set forth" in another part of the contract. Wolf Hollow's reliance on this language is without merit.[8]

Lastly, Wolf Hollow maintains that El Paso's breach of the fuel management services provisions in the Supply Agreement, specifically the requirement in subsection 5.4(b)(v) that El Paso "use Prudent [Fuel Management] Practices to minimize any costs to" Wolf Hollow, means that Wolf Hollow could recover any such costs, including what might otherwise be considered consequential damages.[9] However,

we do not read this reference to "any costs" so broadly. If we did, it would render the bar to consequential damages in section 24.11 meaningless. *See Valence Operating Co.*, 164 S.W.3d at 662 (explaining that in interpreting a contract, courts must consider the entire writing in an effort to harmonize and give effect to all provisions so that none will be rendered meaningless). Wolf Hollow suggests that any other interpretation than the one it offers would effectively render section 5.4(b)(v) meaningless. This is incorrect. Although not mentioned by Wolf Hollow, subsection 5.4(b)(v) actually provides a nonexclusive list of the type of costs contemplated: "hourly variance charges, daily imbalance fees, and monthly cash-out charges assessed by the relevant Transporter under its OBA or Transporter Tariff, storage fees and short-term parking and lending fees." The kinds of costs listed could be considered consequential damages specifically provided for as contemplated in section 24.11. However, the types of damages Wolf Hollow claims in the present lawsuit—physical damage to the plant; costs for cleaning, replacing,

---

8. Without explanation, Wolf Hollow additionally suggests that if section 21.3(c) is not read as an exception to the bar to consequential damages in section 24.11, then section 21.3 would be rendered meaningless. This is incorrect. As stated above, section 21.3(c) is a particularly broad provision that could result in the availability of numerous remedies and was not limited, as Wolf Hollow's argument suggests, to consequential damages. Thus, simply reading the contract such that section 21.3(c) does not implicate consequential damages (due to the section 24.11 waiver of such damages) does not render the provision meaningless.

9. The relevant portions of section 5.4 read as follows:

Section 5.4 *Fuel Manager Scope of Services*. (a) [El Paso] shall implement a comprehensive plan jointly developed by [El

Paso] and [Wolf Hollow] for the procurement and administration of the Fuel Management Services to be provided by [El Paso] in accordance with the terms of this Article V. The Fuel Management Services included in such comprehensive plan shall be performed in a manner consistent with the requirements of Section 5.2 and the other terms of this Article V.

(b) Without limiting Section 5.4(a), but subject to the limitations set forth in this Article V, [El Paso] shall perform the following Fuel Management Services:

. . . .

(v) use Prudent FM Practices to minimize any costs to [Wolf Hollow], including but not limited to, hourly variance charges, daily imbalance fees, and monthly cash-out charges assessed by the relevant Transporter under its OBA or Transporter Tariff, storage fees and short-term parking and lending fees . . . .

and refurbishing; charges for replacement power; and costs for additional equipment—are fundamentally different from the types of costs listed in subsection 5.4(b)(v). As stated, if the list in subsection 5.4(b)(v) is broad enough to include the damages claimed here, then section 24.11 would be impermissibly rendered meaningless. Consequently, Wolf Hollow's arguments based on subsection 5.4(b)(v) are without merit.[10]

Wolf Hollow's asserted damages based on the delivery of contaminated natural gas are all consequential damages barred by the Supply Agreement. Based on the foregoing analysis, the trial court did not err in granting summary judgment against Wolf Hollow's claims based on the four service interruptions or the delivery of contaminated gas. We overrule Wolf Hollow's seventh issue. Because the trial court's ruling on consequential damages defeated all of Wolf Hollow's claims

against El Paso for damages, we need not address Wolf Hollow's other appellate issues seeking reversal of the trial court's judgment for El Paso.[11] Furthermore, our holding on the consequential damages issue renders the trial court's grant of declaratory judgment favoring El Paso on other defensive issues moot.[12] Accordingly, we modify the trial court's judgment to delete the declaratory judgment language.

## C. Summary Judgment on Direct Damages

In issue eight, Wolf Hollow suggests that the trial court's holding that Wolf Hollow take nothing on its claims for direct damages is a nullity because Wolf Hollow did not request direct damages in its pleadings. Based on our analysis above, explaining that all of Wolf Hollow's claims sought consequential and not direct damages, we agree that the trial court's

---

**10.** In its reply brief, Wolf Hollow states that what might be considered consequential damages under the UCC for a gas sales contract might be considered direct damages for breach of a gas management contract. While this statement may be correct under certain circumstances not present here, it is important to note that (1) the bar of consequential damages in section 24.11 was not limited to issues involving only the sale of natural gas but was applicable to the whole contract, including the gas management provisions; and (2) as explained above, the primary focus of the Supply Agreement was the sale of natural gas. The claims made by Wolf Hollow are in essence that El Paso failed to deliver goods on four occasions and delivered contaminated goods in breach of warranty. These are principally sale-of-goods issues that are only tangentially related to the gas management responsibilities (such as to monitor, manage, negotiate, consult, coordinate, and use prudent practices) addressed in subsection 5.4(b)(v). Accordingly, as discussed above, these claims are best addressed under the UCC provisions for the sale of goods.

**11.** In the last section of Wolf Hollow's reply brief, it suggests in one sentence that there

was no resolution of its request in its petition for injunctive relief: "The trial court improperly entered a final judgment without considering or resolving Wolf Hollow's claim for permanent injunction." This point was neither properly raised as an issue on appeal nor properly briefed. *See* Tex.R.App. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *Pat Baker Co., Inc. v. Wilson*, 971 S.W.2d 447, 450 (Tex.1998) ("It is axiomatic that an appellate court cannot reverse a trial court's judgment absent properly assigned error."); *Methodist Hosp. v. Zurich Am. Ins. Co.*, 329 S.W.3d 510, 518 n. 8 (Tex.App.-Houston [14th Dist.] 2009, pet. denied) (declining to consider issue raised for the first time in reply brief).

**12.** El Paso sought declaratory judgment specifically against the claims for past damages that Wolf Hollow made the basis for its counterclaims in this lawsuit. Because we have ruled against Wolf Hollow on the merits of its claims, El Paso's declaratory judgment request regarding those same claims is rendered moot.

holding regarding direct damages was irrelevant to the outcome of this case. The trial court's final judgment does not mention direct damages, and Wolf Hollow does not pray for modification of the judgment on this basis; accordingly, we need make no such modification.

## IV. Summary Judgment for Enterprise

As stated above, Wolf Hollow filed a cross-claim against Enterprise alleging that it negligently delivered contaminated natural gas to the Granbury power plant. Enterprise moved for summary judgment on two grounds: (1) Wolf Hollow is not entitled to recover for negligence based on obligations in a contract to which it is not a party; and (2) the economic loss rule precludes Wolf Hollow from recovering on its negligence claim. The trial court granted Enterprise's motion without specifying the grounds therefor.[13] In its ninth issue, Wolf Hollow challenges both grounds asserted by Enterprise.

## A. Negligence Based on Performance of Contract

■ In its appellate briefing, Enterprise contends that Wolf Hollow's negligence cause of action fails as a matter of law because every "purported 'tort' duty that [Wolf Hollow] alleges arises only from the Transportation Agreement." Enterprise then argues that "[i]t is well established in Texas that a plaintiff cannot take a breach of contract action claim and convert it into a tort claim." While we agree with Enter-

prise's statement of the general rule, our analysis does not end there.

■ Wolf Hollow and Enterprise agree that once Wolf Hollow assigned the Transportation Agreement to El Paso, Wolf Hollow and Enterprise were no longer in contractual privity. Nonetheless, as Enterprise correctly points out, Wolf Hollow cannot escape the limitations on liability found in the Transportation Agreement simply by assigning the contract to a third party. See Seagull Energy E & P, Inc. v. Eland Energy, Inc., 207 S.W.3d 342, 346–47 (Tex.2006). However, a party to a contract can escape liability under the contract if the terms of the original contract expressly or impliedly release the assigning party. Id. at 347. Therefore, the answer here "turns on whether the parties to the [Transportation Agreement] expressly agreed upon the consequences that should follow an assignment . . . to a third party." Id.

As quoted above, the Transportation Agreement provides that Wolf Hollow could assign its rights and obligations under the Transportation Agreement to any party providing fuel management services to Wolf Hollow. The summary judgment evidence establishes that Wolf Hollow assigned the Transportation Agreement to El Paso, the third party providing fuel management services to Wolf Hollow. Furthermore, it is clear from the language of assignment that the parties to the Transportation Agreement expressly agreed on the consequences that would follow an assignment. The language of the assignment clause in Enterprise's filed tar-

---

13. While Enterprise filed multiple motions for summary judgment, the trial court specifically granted only the motion filed on July 31, 2008. In this motion, Enterprise moved for summary judgment only on the grounds mentioned above. On appeal, Enterprise asserts an additional basis to affirm the trial court's summary judgment: Wolf Hollow's negli-

gence claim fails under the filed tariff doctrine. Because this ground for summary judgment was not presented to the trial court in the July 31, 2008 motion, we cannot consider it on appeal as a basis for affirming the trial court's judgment. Travis v. City of Mesquite, 830 S.W.2d 94, 100 (Tex.1992).

iff specifically provides that if Wolf Hollow assigns its interest in the Transportation Agreement to a parent or affiliated company without Enterprise's approval, the assignment would not relieve Wolf Hollow of its contractual obligations. By expressly stating that Wolf Hollow would retain all contractual rights and obligations only if it chose to make the specified type of assignment, the parties expressed an intent that Wolf Hollow would not retain those contractual rights and obligations for any other type of assignment. Consequently, because Wolf Hollow assigned all of its rights and obligations under the Transportation Agreement to El Paso and not to a parent or affiliated company, it did not retain any contractual rights, and therefore, its negligence cause of action is not an improper attempt to convert a contract action into a tort.

▮▮▮ We also disagree with Enterprise's argument that Wolf Hollow's negligence cause of action must fail because a contract created Enterprise's duty to deliver natural gas to Wolf Hollow's power plant. The fact that an act is induced by and done pursuant to a contract does not shield it from regular tort liability. *Goose Creek Consol. I.S.D. of Chambers and Harris Counties, Tex. v. Jarrar's Plumbing, Inc.*, 74 S.W.3d 486, 494 (Tex.App.-Texarkana 2002, pet. denied) (citing *Thomson v. Espey Huston & Assocs.*, 899 S.W.2d 415, 420 (Tex.App.-Austin 1995, no writ)). "One who undertakes to perform a contract assumes a duty to all persons to take reasonable care not to injure them or their property in the performance of that contract, and one who is not privy to the contract may assert a claim for negligence for a breach of that duty." *Id.* Here, Wolf Hollow has alleged and produced summary judgment evidence that Enterprise's negligent performance of the Transportation Agreement physically damaged components of its power plant. The fact that Enterprise's duty to deliver natural gas to Wolf Hollow arose out of a contract (between El Paso and Enterprise) does not prohibit Wolf Hollow's negligence cause of action.

## B.  Economic Loss Rule

▮▮▮ In a related argument, Enterprise contends that the economic loss rule prohibits Wolf Hollow's negligence cause of action. We disagree. The economic loss rule applies when losses arise from the failure of a product, and the damage is limited to the product itself. *Equistar Chems., L.P. v. Dresser–Rand Co.*, 240 S.W.3d 864, 867 (Tex.2007). The rule does not preclude tort recovery if a defective product causes physical harm to the ultimate user or consumer, or other property of the user or consumer, in addition to causing damage to the product itself. *Id.* In Texas, the economic loss rule has been applied to preclude tort claims in two related contexts: (1) where the losses sought to be recovered are the subject matter of a contract between the parties; and (2) when the claims are for economic losses against the manufacturer or seller of a defective product where the defect damaged only the product and did not cause personal injury or damage to other property. *Coastal Conduit & Ditching*, 29 S.W.3d 282, 285 (Tex.App.-Houston [14th Dist.] 2000, no pet.). Once the other parameters are established, the rule bars recovery even if the parties are not in contractual privity. *Id.* at 290.

The subject of the Transportation Agreement is the delivery of natural gas to the Granbury power plant. Wolf Hollow alleges Enterprise negligently performed its duties under that contract by delivering contaminated gas to the plant. Wolf Hollow further alleges that this contaminated natural gas damaged the turbines and oth-

er plant equipment. Because Wolf Hollow alleges that Enterprise's negligence resulted in physical damage to parts of Wolf Hollow's power generating facility, which were not the subject of the Transportation Agreement, the economic loss rule does not preclude those specific claims. *Equistar Chemicals*, 240 S.W.3d at 867. The cases Enterprise relies on in support of its economic loss rule argument are all distinguishable, based on the fact they did not involve physical damage to property separate from the property at issue in the contract; therefore, they do not control the circumstances presented here. *See Sterling Chems., Inc. v. Texaco Inc.*, 259 S.W.3d 793, 796 (Tex.App.-Houston [1st Dist.] 2007, pet. denied) (affirming summary judgment on claims for economic losses resulting from business interruptions; however, trial court denied summary judgment motion on property damage claim and that claim was not at issue on appeal); *Hou–Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103, 107 (Tex.App.-Houston [14th Dist.] 2000, no pet.) (holding that economic loss rule precludes recovery of economic damages only in the absence of personal injury or property damage claims); *Clems Ye Olde Homestead Farms LTD v. Briscoe*, No. 4:07CV285, 2008 WL 5146964, at *5 (E.D.Tex. December 8, 2008) (holding that economic loss rule precluded the plaintiffs' tort claims because they only alleged injuries to the subject of the contract itself). Accordingly, we sustain Wolf Hollow's ninth issue as it relates to Wolf Hollow's negligence claim seeking relief for the physical damage allegedly caused to Wolf Hollow's power plant by the delivery of allegedly contaminated natural gas.

### CONCLUSION

The trial court properly granted El Paso's summary judgment based on the bar to consequential damages in the Supply Agreement. Consequently, we modify the final judgment to remove the declaratory judgment language, and as so modified, affirm the portion of the judgment respecting Wolf Hollow's claims against El Paso. Furthermore, having sustained Wolf Hollow's ninth issue on appeal, we reverse the judgment of the trial court as it relates to Wolf Hollow's negligence claim against Enterprise, seeking relief for property damage allegedly caused to Wolf Hollow's power plant, and remand that claim to the trial court for further proceedings consistent with this opinion.