# IN THE SUPREME COURT OF TEXAS

════════════
No. 11-0059
════════════

EL PASO MARKETING, L.P. AND ENTERPRISE TEXAS PIPELINE LLC, PETITIONER,

v.

WOLF HOLLOW I, L.P., RESPONDENT

══════════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS
══════════════════════════════════════════════════════════

**Argued February 8, 2012**

JUSTICE HECHT delivered the opinion of the Court.

The owner of a gas-fired electric power generating plant sued the owner of the pipeline that supplies fuel to the plant for negligence in allowing interruptions in service and in delivering gas below contractual quality standards. The pipeline owner contends that the suit sounds in contract, not in tort. We agree and thus reverse the court of appeals' judgment.[1] We also consider whether all the plant's claimed damages are consequential damages that it agreed to waive. We remand the case to the court of appeals for further proceedings.

---

[1] 329 S.W.3d 628 (Tex. App.–Houston [14th Dist.] 2010).

# I

El Paso Marketing, L.P. manages the gas fuel supply for an electric power generating plant owned and operated by Wolf Hollow I, L.P. in Granbury, Texas. El Paso purchases the amount of gas needed by Wolf Hollow at a market hub near Pecos, Texas. The gas flows into a commercial pipeline owned by Enterprise Texas Pipeline LLC. Wolf Hollow's plant is connected to the pipeline.

Wolf Hollow and El Paso operate under a Gas Supply and Fuel Management Agreement ("the Supply Agreement"). El Paso and Enterprise, in turn, operate under a Gas Transportation Agreement ("the Transportation Agreement").[2] That agreement was originally between Enterprise and Wolf Hollow, but Wolf Hollow immediately assigned the agreement, with Enterprise's consent, to El Paso.[3] The Transportation Agreement contemplated that assignment,[4] and the Supply Agreement required it.[5]

---

[2] Multiple contracts comprise the complete agreement.

[3] "Wolf Hollow", "El Paso", and "Enterprise" include their predecessors.

[4] A paragraph among the "Additional Special Provisions" of the Transportation Agreement states in upper case letters: "[Wolf Hollow] may assign its rights and obligations under this agreement to any party that provides fuel management services to [Wolf Hollow] or agrees to sell and deliver gas to [Wolf Hollow] at [Wolf Hollow's] plant, upon the consent of [Enterprise], which consent shall not be unreasonably withheld." In addition, Appendix A, Section 22 states: "[The Transportation Agreement] shall inure to and bind the permitted successors and assigns of [Wolf Hollow] and [Enterprise]; provided, neither [Wolf Hollow] nor [Enterprise] shall transfer the . . . agreement without the prior written approval of the other and which approval may not be unreasonably withheld, delayed or conditioned. . . . Provided further, either [Wolf Hollow] or [Enterprise] may transfer its interest to any parent or affiliate by assignment, merger or otherwise without the prior approval of the other, but no such transfer shall operate to relieve the transferor of its obligations hereunder."

[5] Section 4.6 of the Supply Agreement states: "[Wolf Hollow] shall assign to [El Paso] and [El Paso] shall assume the rights and obligations of [Wolf Hollow] under the Gas Transportation Agreements . . . . [El Paso] shall be responsible for the transportation of Gas sold and delivered hereunder to the relevant Point of Delivery pursuant to the Gas Transportation Agreements between [Wolf Hollow] and the relevant Transporter, as assigned to [El Paso]."

Wolf Hollow sued El Paso for breach of the Supply Agreement and Enterprise for negligence. Wolf Hollow asserts two claims. One is based on four interruptions in gas delivery. El Paso and Enterprise contend that each interruption was caused by force majeure, which, under the Supply Agreement, excuses a failure to meet delivery obligations.[6] Wolf Hollow disagrees. Wolf Hollow seeks to recover the cost of replacement power it purchased to meet its delivery obligations while its plant was down. El Paso contends that these are consequential damages waived by the Supply Agreement.[7] Wolf Hollow disputes this characterization and argues that, in any event, such damages are recoverable under Section 21.1 of the Supply Agreement. Section 21.1(a) provides that if El Paso fails to deliver gas as required, other than as excused by force majeure, it must immediately notify Wolf Hollow, which may then purchase replacement gas and recover the extra cost from El Paso.[8] Sections 21.1(b) and (c) provide that if no such gas is available, Wolf Hollow may accept El Paso's offer to provide replacement power, or purchase such power itself and recover the extra cost

---

[6] Section 17.1 of the Supply Agreement states: "For purposes of this Agreement, an 'Event of Force Majeure' means any act or event that prevents the affected Party from performing its obligations (other than the payment of money) under this Agreement if such act or event is beyond the reasonable control of and not a result of the negligence or intentional act of the affected Party and such affected Party has been unable by the exercise of due diligence to overcome or mitigate the effects of such act or event." Further, Section 17.3 states: "If either Party is rendered wholly or partially unable to perform its obligations under this Agreement because of an Event of Force Majeure, that Party shall be excused from whatever performance is affected by the Event of Force Majeure to the extent so affected [subject to various provisos]."

[7] Section 24.11(a) of the Supply Agreement states in upper case letters: "Except as specifically set forth herein, neither party shall be liable to the other party for . . . consequential damages." The Transportation Agreement also waives consequential damages. Appendix A, Section 13.2 states, again in upper case letters: [Enterprise's] and [Wolf Hollow's] liability to each other shall . . . be limited to direct actual damages only. . . . In no event shall [Enterprise] or [Wolf Hollow] be liable to each other for . . . consequential . . . damages . . . ."

[8] Section 21.1(a) of the Supply Agreement states: "Unless excused by an Event of Force Majeure . . . , if at any time [El Paso] determines that it will not be able to . . . deliver . . . , or actually fails to . . . deliver . . . [gas as contractually required, El Paso] shall immediately notify [Wolf Hollow] of [El Paso's] inability to fully perform its obligations . . . and [Wolf Hollow] may seek to cover . . . by making such Gas purchases from other suppliers using the Cover Standard, and upon making such purchases shall be entitled to recover from [El Paso damages for the extra cost]."

3

from El Paso.[9]  The Supply Agreement subjects Wolf Hollow's purchases of replacement gas or power to a "Cover Standard" requiring commercial reasonableness in the circumstances.[10]  El Paso contends that Wolf Hollow cannot recover the extra cost of replacement power because it did not first seek replacement gas.

Wolf Hollow's second claim alleges that from time to time Enterprise delivered gas contaminated with heavy liquid hydrocarbons and thus below the quality specified by the Transportation Agreement.[11]  Section 14.1 of the Supply Agreement requires that the gas El Paso delivers to Wolf Hollow meet those specifications, and that if it does not, El Paso must assign any claim it has against Enterprise to Wolf Hollow.[12]  Enterprise contends that this assignment is Wolf

---

[9] Section 21.1(b) of the Supply Agreement states: "If Buyer has used the Cover Standard . . . to purchase [replacement gas and none] is available, [El Paso] may provide replacement power . . . . [Wolf Hollow] shall accept or reject, at its sole discretion, the proposed replacement power, . . . [and El Paso] may submit other proposals . . . ." Section 21.1(c) states: "If [El Paso] is unable to provide replacement power or [Wolf Hollow] rejects [El Paso's] offer to provide replacement power, [Wolf Hollow] shall be entitled to recover from [El Paso the extra cost of Wolf Hollow's purchasing replacement power]." Section 21.1(c) prescribes in detail the method of calculating the amount due from El Paso, which we refer to simply as "extra cost".

[10] Section 1.1 of the Supply Agreement contains the following definition: "'Cover Standard' means that, if there is an unexcused failure by [El Paso] to deliver any Quantity of Gas pursuant to this Agreement, [Wolf Hollow] shall use commercially reasonable efforts to obtain a replacement Quantity of Gas, alternate power generation fuels or replacement power, at a price reasonable for the delivery area consistent with the amount of notice of the pending unexcused delivery failure provided by [El Paso], the immediacy of [Wolf Hollow's] Gas consumption needs, the Quantity of Gas involved, and the anticipated length of the unexcused delivery failure by [El Paso]."

[11] Quality specifications are set out in Section 14.1 of Appendix to the Transportation Agreement. Appendix A contains what the parties refer to as the pipeline's "Statement of Operating Conditions for Transportation Service" or "Transporter's Tariff". *See* Section 1.1 of the Supply Agreement ("'Transporter's Tariff' means the tariff or statement of operating conditions of EPGT or LSP, as the case may be, as amended or modified from time to time and as approved by the Governmental Authority having jurisdiction."). The details are not at issue here.

[12] Section 14.1 of the Supply Agreement states: "The quality . . . of Gas that [El Paso] sells, delivers or causes to be delivered to [Wolf Hollow] . . . shall meet or exceed the minimum gas quality specifications established in the [Enterprise] Tariff; provided, however, that (i) if [Enterprise] fails to deliver Gas . . . that meets such quality specifications, then [El Paso] shall assign to [Wolf Hollow], or otherwise cause [Wolf Hollow] to be subrogated to, any claim that [El Paso] may have against [Enterprise] as a result of such delivery failure under the [Transportation Agreement] to which [Enterprise] is a party, as assigned by [Wolf Hollow] to [El Paso] . . . ."

4

Hollow's sole remedy for its quality claim. Wolf Hollow disagrees. Wolf Hollow seeks damages for plant repairs and equipment upgrades to prevent future harm to the plant ("plant damages"), as well as replacement-power damages for shutdowns while repairs and upgrades were being made.

We need not detail all proceedings in the trial court. The trial court granted summary judgment motions brought by El Paso and denied summary judgment motions brought by Wolf Hollow. The trial court also granted, without comment, Enterprise's summary judgment motion contending that Wolf Hollow could not assert a negligence cause of action because its claims sounded in contract and its damages were precluded by the economic loss rule. The trial court rendered judgment for El Paso and Enterprise, specifically holding that:

- the four delivery interruptions were each caused by force majeure, excusing El Paso's performance under the Supply Agreement;

- all damages sought by Wolf Hollow are consequential damages waived by the Supply Agreement (and by the Transportation Agreement);

- Wolf Hollow's exclusive remedy for its quality claim is an assignment of any claim El Paso has against Enterprise; and

- El Paso is entitled to declarations regarding force majeure and the exclusive remedy for Wolf Hollow's quality claim.[13]

The court of appeals agreed that the replacement-power damages and plant damages claimed by Wolf Hollow are consequential damages waived in the Supply Agreement.[14] The court did not

---

[13] Specifically, the declaratory judgment stated that the four delivery interruptions were caused by events of force majeure, of which El Paso gave proper notice, and excused under the Supply Agreements; that Wolf Hollow's exclusive remedy for a gas quality claim is an assignment of any claim El Paso has against Enterprise; and that Article XXI of the Supply Agreement does not apply to gas quality claims.

[14] 329 S.W.3d 628, 639, 642 (Tex. App.–Houston [14th Dist.] 2010).

address whether the gas delivery interruptions were excused for force majeure. And having held that Wolf Hollow cannot prevail on its claims, the court concluded that declarations denying the basis for those claims were moot.[15] But the court held that because Wolf Hollow has no contract with Enterprise, it can sue for negligence, and that the action is not barred by the economic loss rule.[16] The court vacated the declaratory judgment and otherwise affirmed judgment for El Paso, reversed the judgment for Enterprise, and remanded the case to the trial court for further proceedings.[17]

El Paso and Enterprise petitioned this court for review, and Wolf Hollow conditionally petitioned for review. We granted all three petitions.[18]

We begin by considering whether Wolf Hollow's claims against Enterprise sound in tort or contract. We then turn to whether Wolf Hollow waived all the damages it asserts in the Supply Agreement. Finally, we consider whether the court of appeals erred in vacating El Paso's declaratory judgment.

## II

"'Tort obligations are in general obligations that are imposed by law — apart from and independent of promises made and therefore apart from the manifested intention of the parties — to avoid injury to others.'"[19] Accordingly, in determining whether an action sounds in tort or

---

[15] *Id.* at 642.

[16] *Id.* at 644-645.

[17] *Id*. at 645.

[18] 55 Tex. Sup. Ct. J. 145 (Dec. 16, 2011).

[19] *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991) (quoting W. PAGE KEETON, DAN B. DOBBS, ROBERT E. KEETON & DAVID G. OWEN, PROSSER AND KEETON ON THE LAW OF TORTS § 92 at 655 (5th ed. 1984)).

6

contract, we look to the source of the duty allegedly violated and the nature of the claimed loss.[20]

Wolf Hollow alleges violations of gas delivery and gas quality obligations that exist only in the

Supply Agreement and the Transportation Agreement. The gist of Wolf Hollow's claims is not that

Enterprise failed to act as a reasonable pipeline should have, which is the liability standard for

negligence, but that it violated specific obligations that might or might not be unreasonable apart

from the parties' agreements. For Wolf Hollow, firm service was crucial; another buyer might elect

interruptible service, which contemplates that deliveries will not be constant.[21] Wolf Hollow's plant

depended on a certain quality of gas, while a gas processor would depend on a supply of raw gas.

Clearly, the duties Wolf Hollow alleges Enterprise violated were imposed by contract, not by law.

Wolf Hollow argues that because it no longer has any contractual relationship with

Enterprise, having assigned the Transportation Agreement to El Paso, it is entitled to sue for

negligence. Enterprise counters that Wolf Hollow cannot shed by assignment the Transportation

Agreement's rights, duties, and limitations. "Generally speaking, a party cannot escape its

obligations under a contract merely by assigning the contract to a third party."[22] But even assuming

that Wolf Hollow's assignment relieved it of its rights and obligations under the Transportation

Agreement, Wolf Hollow's argument is nevertheless flawed. It incorrectly assumes that Wolf

___

[20] *Id*.

[21] *See Midwest Gas Servs., Inc. v. Ind. Gas Co., Inc.*, 317 F.3d 703, 707 n.2 (7th Cir. 2003) ("Firm service is the guaranteed right to receive a certain volume of gas via a specific pipeline. Interruptible service is the right to receive a certain volume of gas from a pipeline out of the excess capacity the pipeline has available, *i.e.*, the pipeline's surplus capacity left after the pipeline has met the needs of its firm service customers. Interruptible service customers usually have alternative fuel sources for their energy needs, such as fuel oil or coal, while firm capacity customers are able to use natural gas as their exclusive fuel source.").

[22] *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 346-347 (Tex. 2006).

7

Hollow must be entitled to sue Enterprise for *something* — if not breach of contract, then negligence. But Wolf Hollow, by its Supply Agreement, can look to El Paso, its gas supply manager, to answer for delivery interruptions, poor quality gas, and other gas supply problems.

Wolf Hollow can enforce Enterprise's gas quality obligations through an assignment of El Paso's claims against Enterprise, to which it is entitled by Section 14.1 of the Supply Agreement.[23] But Wolf Hollow concedes, in this Court, that the consequential damages waivers in the Supply Agreement and the Transportation Agreement[24] preclude it from recovering plant damages on a contractual claim. That explains why Wolf Hollow has refused to accept such an assignment and instead seeks to avoid the waivers by asserting an action for negligence. Wolf Hollow's position is that it augmented its rights against Enterprise by assigning away the contract that created them in the first place. We disagree. Wolf Hollow chose to limit its contractual rights against Enterprise, whether it kept those rights or assigned them away.

El Paso and Enterprise argue that a Section 14.1 assignment is Wolf Hollow's exclusive remedy for its quality claim. Though Wolf Hollow cannot sue Enterprise for negligence, for the reasons we have explained, nothing in Section 14.1 suggests that it cannot sue El Paso for breach of the Supply Agreement in allowing poor quality gas to be delivered. Indeed, the general obligation to supply quality gas under Section 14.1 is El Paso's. But the consequential damages waivers that preclude Wolf Hollow from recovering plant damages on an assigned claim against Enterprise also preclude recovery of such damages on a quality claim against El Paso. The question remains

---

[23] *See supra* note 12.

[24] *See supra* note 7.

whether Wolf Hollow's claim for replacement-power damages is barred by the consequential damages waiver.

### III

"Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong. . . . Consequential damages, on the other hand, result naturally, but not necessarily . . . ."[25] Although Wolf Hollow argues that its replacement-power damages are direct, not consequential, these damages derive entirely from the agreements Wolf Hollow has with its customers and thus do not flow necessarily from plant shutdowns due to gas supply problems. Wolf Hollow's replacement-power damages are not direct damages.

Wolf Hollow nevertheless argues that they are not consequential damages for another reason. The parties agree that the Supply Agreement's consequential damages waiver is governed by the Uniform Commercial Code.[26] The UCC definition of consequential damages excludes cover,[27] defined as "making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller."[28] Wolf Hollow contends that the extra costs it incurred to purchase replacement power to meet its own delivery obligations

---

[25] *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997).

[26] The Supply Agreement calls for the application of New York law, but the parties have not pointed to any material difference between New York law and Texas law, so we presume they are the same. *See Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 685 (Tex. 2006).

[27] TEX. BUS. & COM. CODE § 2.715(b)(2) ("Consequential damages resulting from the seller's breach include . . . "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise . . . .").

[28] *Id*. § 2.712(a).

9

when its plant was shut down due to gas delivery interruptions and poor gas quality were cover and therefore not consequential damages. But the power Wolf Hollow purchased was not, strictly speaking, a substitute for the gas due; the power was a substitute for what was to be produced from that gas. Wolf Hollow argues that by purchasing replacement power, it discharged its obligations to its customers the same as if it had purchased replacement gas. But even assuming that replacement power is similar to replacement gas, it does not fit within the plain statutory language.

Parties may agree, however, to "remedies in addition to or in substitution for those provided" by the UCC.[29] In the Supply Agreement, Wolf Hollow and El Paso contemplated the possibility of interruptions in gas delivery, expressly providing that those caused by force majeure were excused.[30] They further anticipated that Wolf Hollow might not be able to obtain replacement gas to avoid a plant shutdown, that Wolf Hollow could then purchase replacement power instead, and that El Paso would be liable for the extra cost. They agreed to a "Cover Standard" that would apply to "efforts to obtain a replacement Quantity of Gas, alternate power generation fuels *or replacement power*".[31] And in Section 21.1 they set forth the following three-step procedure for covering a lack of gas supply with replacement power:

- Section 21.1(a): If El Paso determines that it will not be able to make the required delivery of gas or actually fails to do so, it must "immediately notify" Wolf Hollow, which can then attempt to cover by purchasing replacement gas.[32]

---

[29] *Id*. § 2.719(a)(1).

[30] *See supra* note 6.

[31] *See supra* note 10 (emphasis added).

[32] *See supra* note 8.

- Section 21.1(b): If replacement gas is not available, El Paso can offer replacement power, but Wolf Hollow is not required to accept it.[33]

- Section 21.1(c): If replacement power is either not offered or not accepted, Wolf Hollow can purchase replacement power and recover the extra cost from El Paso.[34]

The court of appeals held that Wolf Hollow did not comply with the first two steps, which are prerequisites to the third. But there is evidence that it did. El Paso did not notify Wolf Hollow of gas delivery failures until after they occurred. At that point, replacement gas could not avoid a plant shutdown that had already occurred or remedy the power shortage to Wolf Hollow's customers. Only replacement power could remedy that shortage.

It makes sense that the parties would provide for an alternate cover-type mechanism when obtaining replacement gas would be problematic. El Paso contends that Wolf Hollow's plant was connected to a second pipeline, from which it could have taken gas, but it is not clear whether Wolf Hollow had the right to do so. It is even less clear that such a gas source, if available, could have avoided a plant shutdown and the consequent damages to Wolf Hollow.

We thus conclude that there is evidence Wolf Hollow is entitled to recover replacement-power damages under Section 21.1(c) of the Supply Agreement, precluding summary judgment against Wolf Hollow based on the consequential damages waiver.

**IV**

We turn briefly to El Paso's contention that the court of appeals improperly modified the trial court's judgment by deleting its declarations as moot on the ground that all of Wolf Hollow's claims

---

[33] *See supra* note 9.

[34] *Id.*

11

were barred by the waiver of consequential damages in the Supply Agreement. Because we have held that Wolf Hollow may pursue replacement-power damages under the contract, we reverse this part of the court of appeals' judgment.

*       *       *

We hold: Wolf Hollow cannot assert its delivery and quality claims against Enterprise in an action for negligence, and though it could assert its quality claim against Enterprise through an assignment from El Paso, the damages it seeks would be barred by the consequential damages waivers. Those waivers also preclude Wolf Hollow's recovery of plant damages from El Paso, but El Paso has not established that they preclude recovery of replacement-power damages. Because Wolf Hollow's replacement-power claim survives, the trial court's declaratory judgment is not moot. Accordingly, the judgment of the court of appeals is reversed, and the case is remanded to the court of appeals for further proceedings in accordance with this opinion.

_____
Nathan L. Hecht
Justice

**OPINION DELIVERED:** June 15, 2012

12