**Affirmed in Part, Reversed in Part, Remanded, and Majority, Concurring, and Concurring and Dissenting Opinions on Remand filed August 15, 2013.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-09-00118-CV

---

### WOLF HOLLOW I, L.P., Appellant

### V.

### EL PASO MARKETING, L.P. AND ENTERPRISE TEXAS PIPELINE, LLC, Appellees

---

**On Appeal from the 165th District Court
Harris County, Texas
Trial Court Cause No. 2006-70615**

---

## MAJORITY OPINION ON REMAND

Wolf Hollow I, L.P. appeals from a final judgment granted in favor of El Paso Marketing, L.P. and Enterprise Texas Pipeline, LLC. On remand from the Texas Supreme Court, our review is limited to deciding whether Wolf Hollow is entitled to replacement-power damages in its claims against El Paso. The trial court ordered that Wolf Hollow take nothing on these claims. Finding error in

part, we affirm the judgment of the trial court in part, reverse in part, and remand for further proceedings not inconsistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Wolf Hollow owns an electric power plant in Granbury, Texas. The plant generates energy from the burning of natural gas, the supply of which is managed by El Paso. El Paso purchases the gas at a market hub near Pecos, Texas, where it flows into a pipeline owned by Enterprise. Wolf Hollow's plant is connected to that pipeline.

Wolf Hollow and El Paso operate under a Gas Supply and Fuel Management Agreement (the "Supply Agreement"). El Paso and Enterprise, in turn, operate under a Gas Transportation Agreement (the "Transportation Agreement"). The Transportation Agreement was originally executed between Wolf Hollow and Enterprise. Wolf Hollow assigned the agreement to El Paso with Enterprise's consent. The Transportation Agreement contemplated that assignment, and the Supply Agreement required it.

In 2006 and early 2007, Wolf Hollow experienced four interruptions in the delivery of natural gas. The first interruption occurred because of an equipment failure on the Enterprise pipeline. The second interruption occurred when an Enterprise technician made a computer error, which caused protective valves to automatically shut down gas flow to Wolf Hollow's plant. The third and fourth interruptions resulted from other pipeline equipment-failures.

El Paso gave notice of these four interruptions to Wolf Hollow, claiming that they were events of force majeure excused by the Supply Agreement. Wolf Hollow disputed that the interruptions were excused, and also complained about the quality of natural gas that it had been receiving. Wolf Hollow alleged that

2

because the gas had been contaminated by heavy liquid hydrocarbons, it fell below the quality specified by the Transportation Agreement.

## A.   The Trial Court

Faced with these disputes, El Paso petitioned for declaratory judgment, seeking declarations that (1) it was excused from the delivery failures because of events of force majeure, and (2) it was not liable for Wolf Hollow's claims related to the quality of gas delivered. Wolf Hollow filed counterclaims against El Paso, alleging breach of contract and other causes of action not relevant here. It sought the following damages: costs incurred for purchasing replacement power to meet Wolf Hollow's output commitments; costs for physical damage sustained to the plant; costs of procuring additional fuel-treatment equipment; and costs for cleaning, replacing, and refurbishing turbine parts.

El Paso filed a third-party petition against Enterprise, seeking to recover contribution and indemnity for any liability that El Paso might have to Wolf Hollow. Wolf Hollow subsequently filed a cross-claim, alleging that Enterprise was negligent in allowing the interruptions of service and in delivering gas that failed to comply with quality specifications. Wolf Hollow sought damages similar to those pleaded in its action against El Paso.

The trial court resolved all issues in the litigation by ruling on a series of summary-judgment motions filed by El Paso and Enterprise. In its rulings, the trial court disposed of Wolf Hollow's claims against El Paso on multiple grounds, all based on interpretations of language found in the Supply Agreement and the amendments thereto. Among its rulings, the trial court concluded that (1) the four delivery interruptions were caused by events of force majeure, which excused El Paso's nonperformance; (2) all damages sought by Wolf Hollow were consequential damages barred under the Supply Agreement; (3) the Supply

3

Agreement created an exclusive remedy for Wolf Hollow's gas-quality claims, which was an assignment by El Paso of any quality claims it might have against Enterprise; (4) there was no evidence of a breach of the fuel-management portion of the Supply Agreement; and (5) Wolf Hollow released all of its claims for damages. The trial court also granted Enterprise's motion for summary judgment, holding that Wolf Hollow could not assert a negligence cause of action because its claim sounded in contract rather than tort, and because its damages were precluded by the economic-loss rule.

After issuing its summary-judgment orders, the trial court rendered a final judgment that Wolf Hollow take nothing on its claims against El Paso and Enterprise. In the final judgment, the trial court included declarations that (1) the four service interruptions constituted events of force majeure; (2) El Paso gave Wolf Hollow proper notice of these events of force majeure, and El Paso has no liability regarding the incidents; (3) Wolf Hollow's exclusive remedy on its gas-quality claims for gas delivered by Enterprise is to receive an assignment of El Paso's claims against Enterprise; and (4) the default-and-remedies provision of the Supply Agreement does not apply to Wolf Hollow's gas-quality claims.

## B.    The Appellate Court's Opinion

On original submission, we agreed with the trial court's ruling that all of the damages sought by Wolf Hollow were consequential damages, which were waived under the Supply Agreement. Because this waiver defeated each of Wolf Hollow's claims against El Paso, we vacated the trial court's declaratory judgment, concluding that such declarations were moot. We also reversed the trial court's summary judgment with respect to Enterprise, concluding that Wolf Hollow was entitled to pursue a negligence claim against Enterprise and that the action was not otherwise barred by the economic-loss rule. *See Wolf Hollow I, L.P. v. El Paso*

4

*Mktg., L.P.*, 329 S.W.3d 628, 645 (Tex. App.—Houston [14th Dist.] 2010).  Our disposition of these issues made it unnecessary to address some of the trial court's other summary-judgment rulings.

## C.    The Texas Supreme Court's Opinion

The Texas Supreme Court granted review of our decision, and organized its opinion around the following three issues: (1) whether Wolf Hollow's claims against Enterprise sounded in contract or tort, (2) whether Wolf Hollow had waived all of the damages it asserted under the terms of the Supply Agreement, and (3) whether we erred in vacating the declaratory judgment. *See El Paso Mktg., L.P. v. Wolf Hollow I, L.P.*, 383 S.W.3d 138, 142 (Tex. 2012).  As to the first issue, the court concluded that Enterprise's duties were imposed by contract, rather than by law.  Thus, the court held that even though Wolf Hollow no longer had a contractual relationship with Enterprise, Wolf Hollow could not assert an action against Enterprise sounding in negligence.

Addressing the second issue, the court conducted separate analyses of the two types of damages asserted.  Wolf Hollow's "plant damages" represented the alleged damages for plant repairs and equipment upgrades.  Its "replacement-power damages" represented the damages that were allegedly sustained when the plant was shut down.  The court held that the plant damages were consequential, and therefore barred by agreement.  The court reached a different conclusion on the replacement-power damages, which Wolf Hollow had sought in both its delivery and quality claims against El Paso.

Although the replacement-power damages were also determined to be consequential, the court held that Wolf Hollow's claims could still be viable because the parties had bargained for replacement costs in Article XXI of the Supply Agreement, and such costs were specifically excepted from the waiver of

5

consequential damages. The court accordingly concluded that judgment should not have been granted against Wolf Hollow based on the waiver of consequential damages.

Addressing the third issue, the court briefly examined the trial court's declaratory judgment. We previously had determined that the declaratory judgment was moot based on the waiver of consequential damages. The Texas Supreme Court disagreed with that holding, concluding that the declaratory judgment was not moot because Wolf Hollow's replacement-power claims survived the waiver of consequential damages. For that reason, the court reversed our judgment and remanded the case to this court for further proceedings consistent with its opinion.

The parties submitted supplemental briefing on remand outlining the remaining issues to be decided from Wolf Hollow's original appeal. The parties and this court[1] disagree about which issues were actually decided by the Texas Supreme Court.

## II. STANDARD OF REVIEW

The Supply Agreement generally provides for replacement costs if there is an interruption in service or if the gas delivered fails to meet minimum quality specifications. Wolf Hollow sought such costs in its counterclaims, but the trial court, for reasons stated in its declaratory judgment and in its summary-judgment orders, ordered that Wolf Hollow take nothing. In deciding whether Wolf Hollow is entitled to replacement-power damages, we must determine whether the trial court erred in its grant of declaratory relief and whether the trial court erred in granting various summary judgments on some of El Paso's defenses.

---

[1] *See* dissenting opinion.

6

Declaratory judgments rendered by summary judgment are reviewed under the same standards that govern summary judgments generally. *Hourani v. Katzen*, 305 S.W.3d 239, 248 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). We review de novo the trial court's grant of a summary judgment. *Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 644 (Tex. 2009) (per curiam) (citing *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007)). We sustain a summary judgment when (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). Evidence is conclusive only if reasonable people could not differ in their conclusions. *Id.* The evidence is insufficient if "it is 'so weak as to do no more than create a mere surmise or suspicion'" that the challenged fact exists. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009) (quoting *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006)). We must affirm the summary judgment if any of the movant's theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

In a traditional motion for summary judgment, the movant has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). If the movant initially establishes a right to summary judgment on the issues expressly presented in the motion, then the burden shifts to the nonmovant to present to the trial court

any issues or evidence that would preclude summary judgment. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex. 1979). We consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). The movant is entitled to summary judgment only if it conclusively establishes every essential element of its claim or defense as a matter of law. *Clear Creek Basin Auth.*, 589 S.W.2d at 678. On appeal, the summary-judgment movant still bears the burden of showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999).

In a no-evidence motion for summary judgment, the movant represents that there is no evidence of one or more essential elements of the claims for which the nonmovant bears the burden of proof at trial. TEX. R. CIV. P. 166a(i); *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The burden then shifts to the nonmovant to present evidence raising a genuine issue of material fact as to the elements specified in the motion. *Mack Trucks*, 206 S.W.3d at 582. As in a traditional motion for summary judgment, we review the evidence in the light most favorable to the nonmovant, crediting evidence favorable to that party if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *See Timpte Indus.*, 286 S.W.3d at 310.

## III. GOVERNING LAW

When construing a written contract, our primary goal is to ascertain the intent of the parties as expressed in the agreement. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). Ordinarily, the writing alone is

sufficient to express the parties' intentions, because it is the objective, not subjective, intent that controls. *Matagorda Cnty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006) (per curiam) (citing *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968)). To determine intent, we examine and consider the entire writing in an effort to harmonize and give effect to all provisions of the contract, so that none will be rendered meaningless. *Valence Operating Co.*, 164 S.W.3d at 662. No single provision controls; rather, all the provisions must be considered with reference to the entire instrument. *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962). We presume that the parties to the contract intended every clause to have some effect. *Fein v. R.P.H., Inc.*, 68 S.W.3d 260, 266 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) (citing *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)). Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Valence Operating Co.*, 164 S.W.3d at 662. We construe contracts from a utilitarian standpoint, bearing in mind the particular business activity sought to be served, and will avoid, when possible, an unreasonable, inequitable, or oppressive construction. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam). Courts are not authorized to rewrite agreements by inserting additional terms, definitions, or provisions that the parties could have included themselves, or by implying terms for which the parties have not bargained. *Tenneco, Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996). In other words, courts cannot make contracts for the parties. *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 888 (Tex. 1998).

IV. ANALYSIS

## A. Force Majeure excuses El Paso's delivery failures.

The trial court's judgment contained four declarations broadly addressing Wolf Hollow's two causes of action. Regarding Wolf Hollow's delivery claim, the declarations provided that El Paso was not liable for the interruptions in service because the delivery failures were excused by events of force majeure. The facts regarding the cause and duration of each delivery failure are undisputed.[2] The legal question is whether or not these are events of force majeure as described in the contract.

Article XXI of the Supply Agreement provides for Wolf Hollow to recover its replacement-power costs from El Paso in the event of a default, but only if the default were not otherwise "excused by an Event of Force Majeure or by any other provision of this Agreement." In its motion for summary judgment, El Paso argued that its nonperformance was excused because each of the four interruptions constituted an event of force majeure. El Paso's performance was governed by the Supply Agreement, which, as amended, defined an event of force majeure as follows:

> Section 17.1 Event of Force Majeure Defined. For purposes of this Agreement, an "Event of Force Majeure" means any act or event that prevents the affected party from performing its obligations (other than the payment of money) under this Agreement if such act or event is

---

[2] The first failure occurred on August 8, 2006, when there was an equipment failure on the Enterprise pipeline that is used to transport gas to Wolf Hollow's facility. Enterprise remedied the equipment failure the same day. The second failure took place on September 11, 2006, when a technician for Enterprise made a computer error which interrupted the gas flow. Enterprise corrected the problem the same day. On January 8, 2007, the third delivery failure occurred when there was another equipment failure on the Enterprise pipeline, and Enterprise again remedied the problem the same day. Finally, the fourth delivery failure occurred on January 11, 2007, when there was another equipment failure on the Enterprise pipeline. Enterprise remedied the problem the next day.

beyond the reasonable control of and not a result of the negligence or intentional act of the affected Party and such affected Party has been unable by the exercise of due diligence to overcome or mitigate the effects of such act or event. Events of Force Majeure shall include acts of declared or undeclared war; sabotage; landslides; revolution; terrorism; flood; tidal wave; tornado; hurricane; loss or accident during marine or land transportation in the event and to the extent that such loss or accident causes physical damage to the equipment being transported; drought; hail storm; lightning; earthquake; fire; explosion, breakage or accidents to machinery or lines of pipe caused by any event or occurrence of the character herein defined as an Event of Force majeure; civil disturbance; act of God or of the public enemy; any unreasonable delay, action or failure to act of a Governmental Authority . . . ; failure of a Transporter to provide Gas transportation services or the inability to burn natural gas in Buyer's Facility due to an event otherwise described herein as an Event of Force Majeure; . . . provided, however, Events of Force Majeure do not include causes or events affecting the performance of third-party suppliers of goods or services except to the extent caused by an event that otherwise is an Event of Force Majeure hereunder, changes in market conditions that affect the price of Gas or Gas transportation services, the ability to sell Gas to a third-party at a higher price, or the failure to timely apply for or to obtain Approvals that the relevant Party knows or should know as of the date of this Agreement; provided, further, that with respect to [El Paso], any Event of Force Majeure declared by [El Paso] shall be limited to the Events of Force Majeure that arise as a result of (i) the inability to obtain Gas due to freezing of Gas wellheads; (ii) a Texas or Federal regulatory action prohibiting delivery of Gas to electricity generators generally or the burning of Gas by electricity generators generally; or (iii) the interruption or curtailment of firm transportation on pipelines connected to [Wolf Hollow's] Facility.

Relying on the final clause in this definition, the trial court agreed with El Paso and declared that the delivery failures were events of force majeure. In its declarations, the trial court specifically stated the following:

1. The events . . . described in Plaintiff's First Amended Petition and Plaintiff's Motion for Summary Judgment constitute events

of Force Majeure as defined in the Gas Supply and Fuel Management Agreement as amended (herein the "Agreement").

2. El Paso gave Wolf Hollow proper notice of these events of Force Majeure as required by the Agreement and El Paso has no liability regarding the four described incidents.

Wolf Hollow contests the trial court's declarations that the delivery failures qualify as events of force majeure, and bases its challenge on two alternative arguments.

In its first argument, Wolf Hollow maintains that the delivery failures were not events of force majeure because "as a matter of law, the events in question were *not* beyond the control of El Paso." In support of this proposition, Wolf Hollow cites Section 16.1 of the Supply Agreement, which provides as follows:

Possession of and title to Gas sold by [El Paso] to [Wolf Hollow] hereunder shall pass from [El Paso] to [Wolf Hollow] at the relevant Point of Delivery. As between [El Paso] and [Wolf Hollow], until the Gas reaches the relevant Point of Delivery, [El Paso] shall be deemed to be in exclusive control and possession of and have title to and be responsible for such Gas.

Wolf Hollow seems to suggest that because the gas was deemed to be within El Paso's exclusive control, there could be no "act or event" beyond El Paso's reasonable control, as required for an event of force majeure. This argument is unpersuasive. El Paso's control of the natural gas does not determine El Paso's control over the pipeline through which it travels or other external acts and events. If it did, and Wolf Hollow's argument were correct, this reading of the contract would render the force majeure provision meaningless because there would never be an interruption in gas delivery beyond El Paso's control. Wolf Hollow's argument accordingly violates the principle of contract construction that requires us to presume that the parties intended every provision to be effective. *See Fein*, 68 S.W.3d at 266.

In its second argument, Wolf Hollow relies on the first of two provisos in the definition of an event of force majeure. In this proviso, the parties agreed that "[e]vents of Force Majeure do not include causes or events affecting the performance of third-party suppliers of goods or services except to the extent caused by an event that otherwise is an Event of Force Majeure hereunder." Wolf Hollow argues, "This provision makes it clear that, in order to qualify as an Event of Force Majeure, such an event must be caused by an event that is an Event of Force Majeure *as to the third[-]party supplier in question*." Wolf Hollow then suggests that the delivery failures do not qualify under this interpretation because El Paso produced no evidence that the failures themselves were caused by events of force majeure suffered by third parties.

Wolf Hollow's interpretation disregards the context in which this language appears. The first proviso on which Wolf Hollow's argument depends begins with "provided, however," and is immediately followed in the same sentence by a second limiting proviso, which begins with the words "provided further that with respect to [El Paso]." Under this second proviso, any event of force majeure declared by El Paso must be limited to one of three occurrences, including "the interruption or curtailment of firm transportation on pipelines connected to [Wolf Hollow's] facility."

The Texas Supreme Court has explained that each "proviso must be construed as a limitation or restraint upon the authority defined in the clause immediately preceding it. Words such as "'provided, however' . . . mean substantially the same as 'but notwithstanding what is granted above.'" *Knight v. Chi. Corp.*, 144 Tex. 98, 104, 188 S.W.2d 564, 566 (1945). The court further explained that the word "provided" is commonly used to express "a qualification, limitation, condition, or an exception respecting the scope and operation of words

13

previously used." *Id.*, 144 Tex. at 104, 188 S.W.2d at 567 (quoting *Sears v. Childs*, 309 Mass. 337, 345–46, 35 N.E.2d 663, 667 (1941)). Thus, a proviso's "'true office and its general purpose is to restrict the sense or make clear the meaning of that which has gone before.'" *Id.* (quoting *Sears*, 309 Mass. at 346, 35 N.E.2d at 667). Moreover, Wolf Hollow's argument that force majeure should be judged with respect to a third-party supplier runs afoul of the definition of force majeure. The parties' agreement provides that force majeure is an event that prevents "the affected *party*"—defined elsewhere as a signatory to the agreement—"from performing its obligations . . . under this Agreement." Thus, the force majeure analysis must focus on signatory El Paso, not third party Enterprise.

"Freedom of contract allows parties to bargain for mutually agreeable terms and allocate risks as they see fit." *Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007). Here, the parties exercised that freedom by very specifically addressing the types of events that would constitute an event of force majeure excusing El Paso's nonperformance. *See Sun Operating Ltd. P'ship v. Holt*, 984 S.W.2d 277, 283 (Tex. App.—Amarillo 1998, pet. denied) (observing that force majeure is "little more than a descriptive phrase without much inherent substance" and is dictated by the contours defined by the parties in their contract).

As can be seen by the above description of the interruptions, it is undisputed that the four interruptions in the delivery of natural gas to Wolf Hollow's plant resulted from interruptions of firm transportation on the Enterprise pipeline that were beyond El Paso's reasonable control and that it was unable to overcome with due diligence. Therefore, we conclude that under the plain language of the Supply Agreement, the interruptions of delivery constitute events of force majeure, thereby excusing El Paso's nonperformance. We accordingly affirm the portion of

14

the trial court's judgment containing the first and second declarations, which foreclose Wolf Hollow's delivery claims. The remainder of this opinion will focus on Wolf Hollow's claims that El Paso provided them with poor quality gas.

**B.      Section 14.1 does not provide the exclusive remedy for quality issues.**

Wolf Hollow sued El Paso for providing Wolf Hollow with poor quality gas through the Enterprise pipeline. The trial court stated in its third declaration that Wolf Hollow could not recover damages against El Paso because, for gas delivered on the Enterprise pipeline, Wolf Hollow was limited to an assignment of El Paso's claims against Enterprise:

> 3.      Wolf Hollow's exclusive remedy regarding gas quality claims for gas delivered by Enterprise Texas Pipeline is to receive an assignment as set forth in Article XIV, Section 14.1 of any claims that El Paso Marketing, L.P. may have against such transporter.

This declaration was expressly overruled by the Texas Supreme Court. After noting El Paso's argument that Section 14.1 is an exclusive remedy, the court expressly stated, "Nothing in Section 14.1 suggests that [Wolf Hollow] cannot sue El Paso for breach of the Supply Agreement in allowing poor quality gas to be delivered." *El Paso Mktg., L.P.*, 383 S.W.3d at 144.

**C.      Article XXI remedies apply to gas-quality claims.**

The trial court also ruled against Wolf Hollow on its claim that it could invoke Article XXI remedies (including cost of replacement power) for gas-quality problems. The fourth declaration is as follows:

> 4.      Article XXI of the Agreement does not apply to gas quality claims for gas delivered to Wolf Hollow on the Enterprise Texas Pipeline . . . .

This declaration also was rejected by the Texas Supreme Court, which held that "there is evidence Wolf Hollow is entitled to recover replacement-power damages under Section 21.1(c) of the Supply Agreement, precluding summary judgment against Wolf Hollow based on the consequential damages waiver." *Id.* at 145. We previously held that the consequential-damages waiver precluded claims for both quantity and quality failures, but the Texas Supreme Court's reversal of that holding means that Wolf Hollow can sue for replacement-power damages under Article XXI for both quantity and quality delivery failures. Indeed, the court expressly stated that "Wolf Hollow, by its Supply Agreement, can look to El Paso . . . to answer for . . . poor quality gas," *id.* at 143, and, as noted above, that "there is evidence Wolf Hollow is *entitled to recover* replacement-power damages under Section 21.1(c)." *Id.* at 145 (emphasis added). The court further construed Section 21.1 to include a failure to deliver gas "as contractually required." *Id.* at 140 n.8. El Paso was contractually required to deliver gas of a certain *quality*. Thus, the Texas Supreme Court has concluded that replacement-power damages are available for gas that did not meet the quality standards in the Agreement.

We next turn to Wolf Hollow's issues that we did not address in our first opinion, but which could still support reversal of the trial court's judgment.

**D. El Paso was not entitled to no-evidence summary judgment on Wolf Hollow's claims for breach of the fuel-management services provisions.**

El Paso moved for summary judgment on the ground that there was no evidence that it breached the obligations of the fuel-management services provisions under Article V of the Supply Agreement. In our original opinion, we concluded that any damages for such a breach were barred by the consequential-damages provision in Section 24.11. *Wolf Hollow I, L.P.*, 329 S.W.3d at 638. El Paso contends that Wolf Hollow did not challenge that ruling in its brief to the Texas Supreme Court and that this holding is therefore affirmed. We disagree. In

16

its brief to the Texas Supreme Court, Wolf Hollow argued that its damages were direct damages for breach of Article V. Although the Texas Supreme Court agreed with our opinion that all of the damage claims were consequential damages, it held that the parties had contractually agreed to allow claims for replacement power under Section 21.1 of the contract. *El Paso Mktg.*, 383 S.W.3d at 145. As discussed above, the court held that replacement-power damages could be recovered for both quality and quantity problems, and that Section 14.1 did not provide an exclusive remedy for quality issues. *Id.* at 144.

We now examine whether the trial court properly granted the summary-judgment motion. We agree with Wolf Hollow that the motion essentially asked the trial court to conclude that the fuel-management claims did not cover gas quality. In response to the motion, Wolf Hollow argued that the fuel-management duties were broad enough to include gas-quality issues. Wolf Hollow is correct.

The fuel-management duties under the agreement are very broad, requiring El Paso to manage the gas transportation and to use prudent fuel-management practices to minimize costs to Wolf Hollow. Wolf Hollow also produced summary-judgment evidence that El Paso both had and breached these obligations. This evidence included testimony from an El Paso corporate representative that his responsibilities as fuel manager included responsibility for gas quality. Wolf Hollow additionally produced evidence that El Paso failed to monitor the quality of gas and that there were numerous breaches of El Paso's obligations to deliver quality gas.

Because the fuel-management services provisions include matters of gas quality, and because Wolf Hollow produced competent evidence supporting a claim for breach of the fuel-management services provisions, it was error for the trial court to grant El Paso's no-evidence motion for summary judgment. We

17

therefore reverse the trial court's order that Wolf Hollow take nothing on any claims related to El Paso's breach of the fuel-management services provisions and remand that claim for trial; however, damages for this breach, if any, would be limited to replacement-power damages.

**E.     There was no release or waiver of claims related to gas quality.**

In our previous opinion, we did not reach Wolf Hollow's issue that the trial court erred in granting summary judgment on release and waiver of claims related to gas quality. El Paso filed an original motion for summary judgment based on the "First Amendment" to the contract and then filed supplemental briefing in which it argued that Section 16.1 of the Agreement also operated as a release. The parties and the trial court appear to have considered this supplemental brief to be a separate motion for summary judgment. The trial court signed two summary-judgment orders sustaining El Paso's release arguments. One order dealt with release under the First Amendment generally, and the other order concerned release under Section 16.1.

*1.     The First Amendment*

El Paso filed a traditional motion for summary judgment in which it argued that Wolf Hollow released its gas-quality claims when it signed the First Amendment to the Contract on December 22, 2005. The release language in the First Amendment provides in pertinent part as follows:

> [Wolf Hollow releases El Paso for any claims that either of them] ever had, now has or may hereafter have . . . which arise out of or relate to the Agreement based on . . . [El Paso's] alleged failure to deliver to [Wolf Hollow] [g]as meeting the quality requirements set forth in Section 14.1 of the Agreement *as stated by [Wolf Hollow] in the letters attached to this Amendment . . . .*[3]

---

[3] Emphasis added.

18

The letters attached to the amendment concern quality claims for gas delivered in 2004.

El Paso argues that this language acts as a release for the quality problems that arose in 2006, a year after the First Amendment was signed. We disagree. There is nothing in the release that addresses future gas deliveries. While the release mentions future claims, the reference to the letters attached to the amendment shows that the parties were releasing future claims only in connection with the 2004 delivery problems. *See Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 20 S.W.3d 692, 698 (Tex. 2000) (noting that a valid release must mention the claim to be released, but may encompass damages that may develop in the future from the claim mentioned); *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991) (explaining that courts narrowly construe general release clauses and "any claims not clearly within the subject matter of the release are not discharged"); *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 850 & n.7 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (op. on reh'g) (collecting cases enforcing release restrictions and holding that a release of claims relating to certain agreements did not act as a release of unmentioned tort claims).

We therefore conclude that the trial court erred in granting summary judgment on this basis.

### 2. Section 16.1

El Paso argues that Section 16.1 operates to extinguish Wolf Hollow's claim. In Section 16.1, the parties agreed that title passes at the point of delivery. They further agreed that during the time one party held title, that party would indemnify the other party as follows:

> As between them, . . . each assumes full responsibility and liability for and shall indemnify, defend and save harmless the other Party . . . on

19

account of any and all damages, claims or actions, including damage to property or injury to or death of persons, arising from any act or accident occurring while title to the Gas is vested in the indemnifying Party . . . .

El Paso argues that all of Wolf Hollow's damages occurred after it had title, and thus, this language acts as a release for those damage claims. In support of this argument, El Paso relies on *Cole v. Johnson*, 157 S.W.3d 856 (Tex. App.—Fort Worth 2005, no pet.). The facts in *Cole* are quite different from the facts of this case. The Coles purchased a house "as-is" from Johnson. *Id.* at 861. The house had foundation problems, and in exchange for a price reduction, the Coles agreed to hold Johnson "harmless of any present or future repair." *Id.* The Second Court of Appeals concluded that the Coles had released their claims against Johnson by that provision. *Id.* at 861–62. We do not find the *Cole* case controlling. El Paso also relies on *Helmerich & Payne International Drilling Co. v Swift Energy Co.*, 180 S.W.3d 635 (Tex. App.—Houston [14th Dist.] 2005, no pet.). That case, however, deals with third-party claims and is not on point.

Indemnity agreements generally do not apply to claims between the parties. *Wallerstein v Spirt*, 8 S.W.3d 774, 780 (Tex. App.—Austin 1999, no pet.) (citing *Derr Constr. Co. v City of Houston*, 846 S.W.2d 854, 858 (Tex. App.—Houston [14th Dist.] 1992, no writ)). And releases typically contain the language "release, discharge, relinquish." *Derr Constr. Co.*, 846 S.W.2d at 858. A release must also identify the claim released. *Baty*, 63 S.W.3d at 848. Section 16.1 contains no typical release language and does not identify a claim to be released, but instead relates to third-party claims; thus, we conclude that this provision does not operate as a release of Wolf Hollow's claims for replacement-power damages. We therefore hold that the trial court erred in granting summary judgment on this basis.

## V. CONCLUSION

In its first and second declarations, the trial court correctly held that El Paso's nonperformance was excused under the contract. Because the four delivery interruptions qualify as events of force majeure, Wolf Hollow is not entitled to replacement-power damages under Article XXI of the Supply Agreement for these events. We therefore affirm the portion of the trial court's judgment concerning recovery of damages for the four delivery failures.

The Texas Supreme Court effectively reversed the trial court's third and fourth declarations. We additionally reverse the summary judgments as to the fuel-management claims and as to waiver and release. Thus, we affirm the trial court's judgment in part, reverse it in part, and remand the case for trial on Wolf Hollow's claims for replacement-power damages for the failure to deliver quality gas.

/s/    Tracy Christopher
Justice

Panel consists of Chief Justice Hedges and Justices Christopher and Busby (Busby, J., concurring; Hedges, C.J., concurring and dissenting).

21