**Motion for Rehearing Denied, Affirmed in part, Reversed and Remanded in part, Memorandum Opinion filed January 23, 2014 Withdrawn, and Substitute Memorandum Opinion filed February 20, 2014.**



In the

# 𝔉𝔬𝔲𝔯𝔱𝔢𝔢𝔫𝔱𝔥 𝔒𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

### NO. 14-12-00839-CV

**JAAV INVESTMENTS, LLC, Appellant,**

**v.**

**AMCAP MORTGAGE, LTD., Appellee.**

**On Appeal from the 61st District Court
Harris County
Trial Court Cause No. 2009-73072**

## S U B S T I T U T E   M E M O R A N D U M   O P I N I O N

In eleven issues, appellant JAAV Investments, LLC, challenges the trial court proceedings and the sufficiency of the evidence supporting the jury's findings in favor of appellee Amcap Mortgage, Ltd., for mortgage fraud. Although we deny JAAV's motion for rehearing, we withdraw the memorandum opinion issued in this case on January 23, 2014, and issue this substitute memorandum

opinion. We sustain JAAV's legal insufficiency challenge to the measure of damages submitted to the jury. Amcap, however, presented some evidence of the correct measure of damages. Therefore, we reverse the trial court's judgment on Amcap's fraud claim against JAAV, and remand such claim for a new trial. We otherwise affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This appeal involves a judgment against the seller of a townhome, appellant JAAV Investments, LLC, in favor of the mortgage company involved in the transaction, appellee Amcap Mortgage, Ltd. Amcap had listed as defendants JAAV and Michael Citizen, the purchaser of the townhome, along with several other corporations and individuals it alleged were part of the fraud. However, JAAV and Citizen were the only defendants brought to trial.

Amcap loaned money to Citizen to purchase a townhome located at 1005 Gillette Street in Houston, Texas, which was one of three townhomes in the area built by JAAV. JAAV took out a construction loan with Sterling Bank to build the properties. Phuong Nguyen, a JAAV partner, testified that at various points he contracted with several real estate agents regarding the 1005 Gillette property. At one time, the property was listed for sale on the Multiple Listing Service ("MLS"), but the listing was terminated on October 3, 2007. The property was not listed on the MLS and was not the subject of a real estate agent contract at the time of the sale to Citizen.

Citizen found out about the JAAV property from Jimmy Thomas. When Citizen and his wife were having problems, he asked Thomas to help him find a home. Citizen testified he never saw the property prior to closing, and he only spoke with Thomas and a woman named Dana Davis prior to closing on the property. Thomas worked for a company called Osaca International, and Dana

2

Davis was a loan officer who prepared Citizen's loan application that was then sent by Lone Star Realty & Mortgage to Amcap. The loan application was supported by W-2s, paystubs, and a credit report. However, at trial, Citizen testified that information included with the loan application, including his income and assets, was incorrect. Citizen also testified that he gave accurate information to Davis and he was not aware any inaccurate information was submitted to Amcap until this lawsuit.

The loan application also indicated that Citizen would make a cash down payment at closing. A representative for Amcap, Phillip Garrett Clayton, testified at trial that whether the buyer makes a cash down payment at closing is considered by Amcap when it is deciding whether to make the loan. The "New Home Contract," executed between JAAV and Citizen[1] on February 15, 2008, did not indicate that a broker or agent was involved with the transaction and showed Citizen would bring a down payment to the closing.

At the closing on March 11, 2008, Nguyen brought a cashier's check for $24,005.50 that he had purchased using JAAV funds to serve as the down payment. However, the cashier's check listed Michael Citizen as the purchaser. At trial, Nguyen testified that the title company involved, Pinnacle Title, told him to designate Citizen as the purchaser on the check.

Also at the closing, Nguyen signed a "Settlement Statement," a form from the U.S. Department of Housing and Urban Development commonly called a "HUD-1." At trial, the HUD-1 was admitted into evidence. The HUD-1, which is generated by the title company, summarizes all payments made during the transaction. The HUD-1 in this case demonstrates that Citizen made a cash down

---

[1] Citizen testified that he did not remember signing the contract for the sale of the townhome and the only paperwork he remembers signing was at the closing.

3

payment of $24,005.50, with the remaining balance paid from the $356,250 Amcap loan. Clayton testified that before funding is authorized, all parties review the HUD-1 settlement statement. During cross-examination, Clayton said that he was unable to testify whether he personally had been the one to review the HUD-1 or any other documentation regarding this loan prior to funding.

As to funds JAAV received at the sale, the HUD-1 indicates the property sold for $375,000. The HUD-1 also shows Lone Star Realty & Mortgage was paid $7,125 from seller's funds at closing for the loan origination fee,[2] and Osaca International was paid $36,000 from seller's funds for "services." Additionally, the HUD-1 shows $270,000 was paid from seller's funds to an unnamed source. At trial, Nguyen testified that the $270,000 was paid to Sterling Bank at the time of the sale toward JAAV's construction loan.

According to Clayton, the HUD-1 would indicate if a real estate broker was involved in the transaction. The HUD-1 at issue here did not specifically indicate that any payments were made from seller's funds for broker services.

At the time of closing, Danny Wells appraised the property at $375,000. According to Wells, who testified at trial, his appraisal indicated that the borrower would be making a down payment at closing. Wells testified that his appraisal is relied on by parties to the transaction, including lenders. Clayton testified that he could not remember whether he personally reviewed the appraisal on the 1005 Gillette property, but that Amcap's system requires underwriters to review appraisals prior to approving the loan. Wells also testified that the real estate market had declined since he appraised the 1005 Gillette property in 2008.

Amcap often sells its loans on the secondary market, and it sold this

---

[2] The HUD-1 indicates Lone Star Realty & Mortgage also received other payments from JAAV, including $2,471.88 paid outside of the closing transaction.

4

particular loan to Wells Fargo. Wells Fargo foreclosed on the property when Citizen failed to make payments. Citizen acknowledged that he only ever made one mortgage payment for the 1005 Gillette property, in the amount of $1,500. Clayton testified that about a year after the loan was funded, Amcap had to repurchase the loan from Wells Fargo for $423,000. Amcap had to buy back the loan when "misrepresentations" were discovered because Amcap warranted to Wells Fargo that information regarding the borrower was correct, according to Clayton. When Amcap repurchased the loan, it became the owner of the property at 1005 Gillette. Amcap then spent about $20,000 to $30,000 making repairs to the property to prepare it for sale. After listing the property for about a year, Amcap sold the townhome for $200,000.

At trial, the case was submitted to a jury on fraud theories. The jury returned its verdict in favor of Amcap against JAAV, finding damages of $223,000, based upon Amcap's cost to repurchase the note versus the fair market value of 1005 Gillette. The jury also found Amcap five percent responsible for these damages. With regard to Citizen, the jury found that he committed no fraud against Amcap.[3] On June 13, 2012, the trial court signed its final judgment based on the jury's findings, ordering that Amcap take nothing on its claims against Citizen and awarding Amcap damages totaling $211,850 on its fraud claim against JAAV. The trial court also granted Amcap's post-trial motion to amend its pleadings to conform to the verdict award on damages.

In eleven[4] issues, JAAV appeals the final judgment and order granting Amcap leave to amend. In issues one and two, JAAV challenges the legal and

---

[3] The jury also found that Citizen failed to comply with the note agreement but awarded no damages.

[4] JAAV misnumbered its issues in its brief. We have renumbered them based on the order in which JAAV addresses them.

5

factual sufficiency of the evidence to support the jury's damages finding. In issue three, JAAV argues the trial court erred in submitting the damages question based on the legal and factual insufficiency of the evidence that such consequential damages were foreseeable, and directly traceable to and resulting from the fraud. In issue four, JAAV contends the trial court erred because no pleading supported submission of the damages issue. In a related fifth issue, JAAV argues that the trial court erred by granting Amcap leave to file a post-trial amendment to the pleadings. In issue six, JAAV contends that the trial court erred in submitting its fraud questions because statutory fraud does not apply to mortgage transactions. In issues seven and eight, JAAV attacks the legal and factual sufficiency of the evidence to support the jury's finding that JAAV committed fraud. In issue nine, JAAV argues that the trial court erred because no pleading supported submission of the fraud issue. In a related tenth issue, JAAV also argues that the trial court erred by granting Amcap leave to file a post-trial amendment to the pleadings. In issue eleven, JAAV contends that the trial court erred by not submitting the fraud and comparative fault of Davis to the jury. While issue three is dispositive, we also address issue seven as a potential rendition point.

## II. ANALYSIS

### A. Standard of review

Generally, when a party presents multiple grounds for reversal of a judgment on appeal, we should first address those points that would afford the party the greatest relief. *Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999) (citing Tex. R. App. P. 43.3) (per curiam). Likewise, when both legal and factual insufficiency issues are raised, we are required to rule on the "no evidence," or legal insufficiency, issues first. *Wal-Mart Stores, Inc. v. Redding*, 56 S.W.3d 141, 146 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (citing

*Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981)).

A legal sufficiency or no evidence challenge will be sustained when: (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998). When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding, making every reasonable inference to support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict at issue. *Id.*

In its seventh issue, JAAV insists that no material misrepresentation was made by JAAV to Amcap, Amcap did not rely on any misrepresentation, and JAAV did not make any misrepresentation intending that Amcap should act on it. However, there is evidence Nguyen misrepresented that the source of the closing down payment on 1005 Gillette was Citizen when actually it was JAAV itself. This false statement was made in the new home contract, the closing check, and the HUD-1. Clayton testified that the down payment's coming from the borrower as opposed to a third party is important when determining whether to issue a loan; if Amcap knew the down payment had not come from Citizen, as indicated in the HUD-1, it would not have funded the loan. Viewing the evidence in the light most favorable to the jury's finding, and making all reasonable inferences in support of the finding, we conclude a reasonable jury could have found JAAV committed

7

fraud. *See id.* Therefore, we overrule this legal insufficiency issue.

We turn now to JAAV's third issue because it is dispositive.

**B.    The evidence of foreseeability is legally insufficient to support the consequential damages awarded at trial.**

In its third issue, JAAV argues that the trial court erred in submitting question 4(a) on damages because it asked and permitted the jury to find consequential damages when Amcap produced no evidence showing the damages were foreseeable to and traceable to JAAV or its fraudulent actions. Amcap responds that the measure sought in question 4(a)—the cost to repurchase the note versus the fair market value of 1005 Gillette—represents Amcap's direct damages from the fraud, rather than consequential damages. Amcap provides no argument with regard to its proof of consequential damages.

We review the trial court's submission of jury questions under an abuse of discretion standard. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh'g). An abuse of discretion occurs when the trial court acts without reference to any guiding principles. *Id.* The trial court "shall submit the questions, instructions and definitions . . . which are raised by the written pleadings and the evidence." Tex. R. Civ. P. 278; *see also Harris Cnty. v. Smith*, 96 S.W.3d 230, 236 (Tex. 2002) ("A litigant should not be powerless to require the trial court to fulfill its duty of submitting only those questions and instructions having support in the pleadings and evidence.").

In reviewing a complaint that there was no evidence to support the submission of a question to the jury, we "view the evidence and inferences in the light most favorable to the party with the burden of securing the finding, disregarding all evidence and inferences to the contrary." *Murphy v. Seabarge, Ltd.*, 868 S.W.2d 929, 932–33 (Tex. App.—Houston [14th Dist.] 1994, writ

denied) (citing rule 278 and applying legal sufficiency standard). "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). However, if the evidence furnishes a reasonable basis for differing conclusions by reasonable minds as to the existence of the vital fact, then there is some evidence, and the issue must be submitted. *Id.*; *see Murphy*, 868 S.W.2d at 933.

For common-law fraud, Texas recognizes two measures of direct damages: out-of-pocket and benefit-of-the-bargain. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998). When properly pleaded and proved, consequential damages also may be recoverable. *Id.* at 49 n.1; *see Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816–17 (Tex. 1997) ("At common law, actual damages are either 'direct' or 'consequential.'"). For consequential damages to be recoverable, they must be foreseeable and directly traceable to and result from the fraud. *Arthur Andersen*, 945 S.W.2d at 816 ("[I]f [consequential] damages are too remote, too uncertain, or purely conjectural, they cannot be recovered."). Amcap agrees with this standard for consequential damages.

Amcap argues that the measure included in the charge represents Amcap's direct damages, citing the *Formosa* court's definition of out-of-pocket damages: "the difference between the value of that which he has *parted with*, and the value of that which he has received." *See Formosa*, 960 S.W.2d at 49 (alteration in original) (citation omitted). Arguably, question 4(a) only contemplates direct damages because it does not instruct the jury to find proximate causation, which is required to award consequential damages. *See El Paso Dev. Co. v. Ravel*, 339

S.W.2d 360, 363–65 (Tex. Civ. App.—El Paso 1960, writ ref'd n.r.e.), *cited and relied on in Arthur Andersen*, 945 S.W.2d at 816, *and Trenholm v. Ratcliff*, 646 S.W.2d 927, 933 (Tex. 1983).

However, direct damages, including out-of-pocket damages, are calculated at or as of "the time of sale." *Arthur Andersen*, 945 S.W.2d at 817; *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 373 (Tex. 1984) (op. on mot. for reh'g); *see also Fazio v. Cypress/GR Houston I, L.P.*, 403 S.W.3d 390, 395 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (en banc) (concluding that direct damages were properly measured at the time of the purchase agreement induced by fraud, by considering purchase price and market value of the property at the time of the sale, rather than looking to the loss on the investment during the next three years). Further, direct damages are a "necessary and usual result of the defendant's wrongful act." *Arthur Andersen*, 945 S.W.2d at 816.

For example, in *Arthur Andersen*, the Texas Supreme Court held that when a corporation relied on a faulty audit to purchase another company, the entire purchase price could not be considered direct damages. *Id.* at 816−17. Because the purchased company did not declare bankruptcy until fourteen months after the sale, the court held losses that occurred subsequent to the time of the sale should be treated as consequential damages. *Id*. at 814, 817.

In this case, we conclude the measure of damages in the jury charge—the cost to repurchase the note versus fair market value—refers to consequential damages that would only be recoverable if it is found they are the "proximate result" of the fraud. *See id*. at 816−17. Amcap cites, and we have located, no authority suggesting that the cost of repurchasing a note from a secondary lender is a necessary and usual expense resulting from fraud in the original loan transaction. Like the decline of the purchased company in *Arthur Andersen*, repurchasing the

10

loan at a premium one year later under its contract with Wells Fargo, and selling the property for a significantly smaller amount one year after that, was a subsequent loss for Amcap. *See id.*; *see also, e.g., El Paso Mktg., L.P. v. Wolf Hollow I, L.P.*, 383 S.W.3d 138, 144 (Tex. 2012) (concluding that funds expended by owner of power plant to purchase replacement power to fulfill its delivery obligations when its gas supplier breached contract "derive entirely from the agreements Wolf Hollow has with its customers" and are not direct damages); *Cherokee Cnty. Cogeneration Partners L.P. v. Dynegy Mktg. and Trade*, 305 S.W.3d 309, 314 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (concluding that profits lost on contract itself are considered direct damages while profits lost on other contracts or relationships resulting from breach may be classified as consequential damages).

By objecting to the submission of the cost to repurchase the note versus fair market value damages question,[5] which objection the trial court overruled, JAAV preserved its "no evidence" challenge that the evidence was legally insufficient to support the trial court's decision to submit this measure of consequential damages to the jury. *See Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex. 1991). The measure only should have been submitted if there was some evidence of foreseeability. *See Superior Broad. Prods. v. Doud Media Grp., L.L.C.*, 392 S.W.3d 198, 210 (Tex. App.—Eastland 2012, no pet.) (concluding that evidence

---

[5] JAAV provided this objection to question 4:

Additionally, there's no evidence to support the submission. The same with both A and B.

Additionally, the damages—the cost to repurchase the note versus the fair market value of the note, those damages are too remote to be considered for—as damages caused by JAAV.

The purchase of a note is not something that would be foreseeable. It's not within JAAV's control. It's not within JAAV's business to know that this was happening. JAAV had nothing to do with the making of the promissory note.

11

supported trial court's decision to submit consequential damages question to the jury because testimony of radio transmitter vendor demonstrated foreseeability by acknowledging that radio stations like plaintiff's lose money when a transmitter failure causes them to cease a broadcast).

Here, even indulging every reasonable inference in favor of Amcap, there is not more than a scintilla of probative evidence of foreseeability to support the measure of consequential damages submitted to the jury. Clayton testified that Amcap is a Freddie Mac seller/servicer that "retains a small percentage" of loans to service, but sells the bulk of its loans on the secondary market to Freddie Mac, Fannie Mae, or to bank investors like Wells Fargo. However, at trial, no party adduced evidence describing the foreseeability of damages due to a loan's being sold on the secondary market under a contract that would require repurchase at a premium in the case of fraud. Unlike in *Superior Broadcast Products*, where the defendant acknowledged that the damages described would occur in the radio industry, there was no testimony by JAAV, or otherwise, acknowledging that many loans are sold on the secondary market under such contracts and result in losses due to required repurchase at a higher amount. *See id*. Further, Amcap acknowledged that it keeps some of its loans to service itself. Clayton also testified that Freddie Mac or Wells Fargo could refuse to buy loans if Amcap did not follow certain "underwriting procedures," such as providing adequate documentation regarding the borrower's "income and intent to live in the property that you're financing, liquid assets." Thus, the evidence does not furnish a reasonable basis for reasonable minds to differ as to whether it was foreseeable to JAAV—as the consequence of its alleged fraudulent misrepresentations—that if Amcap chose to not keep and service the loan, and the secondary market loan purchaser later discovered "misrepresentations" in that loan, then Amcap would be

12

required by contract to buy back that loan at a premium, and would not be able to sell the property except at a loss. *Cf. id.*

Therefore, the trial court erred by improperly including this damages measure in the charge. If the trial court errs when it submits its jury charge, we will reverse where harm results. *See Lone Star Gas Co. v. Lemond*, 897 S.W.2d 755, 756–57 (Tex. 1995) (per curiam). For harm to result, the legal error must probably cause the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1). This improper question was the only damages issue submitted, and answered, with respect to defendant JAAV. As a result, the jury reached an improper verdict, which ultimately led to the rendition of an improper judgment as to JAAV. Accordingly, we sustain JAAV's third issue.

## C.    We remand for a new trial on Amcap's fraud claim against JAAV.

However, we also must decide whether this reversible error properly results in rendition or remand. Generally, "when we sustain a no evidence point of error after a trial on the merits, we render judgment on that point." *Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 841 (Tex. 1997) (citing *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 86 (Tex. 1992)). However, if there is "some evidence of the correct measure of damages," we reverse and remand the cause for a new trial. *Formosa Plastics*, 960 S.W.2d at 51 (holding that appellate court can remand for new trial when no evidence supports damages awarded but there is evidence of some damages); *see Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 682 (Tex. 2000) (holding remand for a new trial is appropriate remedy that where there is evidence of some fraud damages but there is no evidence to support the full amount of damages found by the jury).

Here, the jury was not asked to find direct damages attributable to JAAV's fraud. Rather, the jury improperly was asked to determine consequential damages,

13

for which we have concluded there is no evidence of foreseeability.  Our review of the record indicates there is legally sufficient evidence to show that Amcap suffered some direct damages as a result of JAAV's fraud—namely out-of-pocket damages from its issuing a loan in the amount of $356,250 to Citizen, who acknowledged that at most he made one mortgage payment on the 1005 Gillette property for $1,500.  There is also evidence that Amcap ultimately was able to sell the property for $200,000.  Under these circumstances, we conclude that the appropriate remedy is remand for a new trial.  *See Formosa Plastics*, 960 S.W.2d at 51; *Rente Co. v. Truckers Express, Inc.*, 116 S.W.3d 326, 335 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (applying *Formosa Plastics* and remanding for new trial where evidence legally sufficient to show plaintiff suffered "some damage" as result of lease agreement breach); *see also Playboy Enters., Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 272 (Tex. App.—Corpus Christi 2006, pet. denied) (same where evidence legally sufficient to show cross-claimants suffered some damages as result of fraud); *cf. Andersen*, 945 S.W.2d at 817 ("[B]ecause we find some evidence that Arthur Andersen's misrepresentation was a producing cause of PECO's loss, we remand this case for a new trial.").

Because this issue is finally dispositive of JAAV's appeal, and the interests of justice require a remand for another trial regarding Amcap's fraud claim against JAAV, we need not reach JAAV's additional issues.  *See* Tex. R. App. P. 43.3(b), 47.1.

14

### III. CONCLUSION

Accordingly, we reverse that portion of the trial court's judgment regarding Amcap's fraud claim against JAAV, and remand for a new trial regarding this claim. We otherwise affirm the judgment of the trial court.

/s/     Marc W. Brown
        Justice

Panel consists of Justices Christopher, Donovan, and Brown.